**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| ANDREEA GOCIMAN, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> LOYOLA UNIVERSITY CHICAGO, <br><br> Defendant. | Case No. <br><br> **CLASS ACTION COMPLAINT** <br><br>   **(1) BREACH OF CONTRACT;** <br>   **(2) RESTITUTION BASED ON QUASI CONTRACT; and** <br>   **(3) CONVERSION.** <br><br> JURY TRIAL DEMANDED |

Plaintiff Andreea Gociman ("Plaintiff"), individually and on behalf of all other similarly situated individuals (collectively, the "Class," as more fully defined below), brings this class action complaint against the Loyola University Chicago ("Loyola," the "University" or "Defendant"). Plaintiff makes the following allegations upon personal knowledge as to her own acts and upon information and belief and her attorneys' investigation as to all other matters.

I.   <u>**NATURE OF THE ACTION**</u>

1.    This is a class action brought on brought on behalf of Plaintiff and other similarly situated individuals who paid tuition and fees for on-campus courses at Loyola University Chicago and who have not been refunded a prorated portion of those fees after Loyola abruptly closed its doors to students and hastily shifted from the in-person, on-campus classwork for which Plaintiff and others paid, to online courses due to the Coronavirus Disease 2019 ("COVID-19").

2.    Plaintiff and these other proposed Class members are students, families,

and student guarantors who paid millions of dollars in tuition and fees to Loyola (the "Class") and who, as a result of Defendant's wrongful acts, (i) have not received refunds or reimbursements for the unused services for which they paid; and/or (ii) have not received any refund or reimbursement for the decreased value of the education that Defendant provided when classes transitioned from in-person instruction to an entirely online and far less valuable format.

3.    Loyola University is a private Catholic research university comprised of 11 schools and colleges in Chicago, Illinois and the surrounding area. The University caters to both undergraduate and graduate students, offering over 80 undergraduate majors in fields ranging from chemistry to dance, and over 140 graduate, professional, and graduate-level certificate programs.

4.    In 2018, Loyola University enrolled nearly 12,000 undergraduates and roughly 5,000 graduate students, for a total enrollment of more than 17,000. Loyola charges a fixed amount of tuition to students. In 2019, Loyola had an endowment of more than $800 million.[1]

5.    In early March 2020, in response to COVID-19, the University completely changed the way in which it provided instruction and services to students. On Monday, March 9, 2020—students' first day back from spring break—the University advised faculty that courses could begin moving online.[2] A few days later, on Thursday, March 12, the University announced that, effective March 13 and continuing through the end of the semester, "all in-person, face-to-face classes will

---

[1] Loyola University Chicago – Consolidated Financial Statements And Independent Auditors' Report: For the years ended June 30, 2019 and 2018, Deloitte & Touche LLP (September 19, 2019) https://www.luc.edu/media/lucedu/finance/pdfs/fy19_financial_statements.pdf (last visited May 26, 2020).
[2] Loyola University Chicago – Message Sent To All Faculty from the Office of the Provost, "Preparing for Online Classes" (March 9, 2020, 5:38 pm CT) https://www.luc.edu/coronavirus/previousmessages/2020-0309-preparingforonlineclasses.shtml (last visited May 26, 2020).

be suspended."[3] All classes would move online "as soon as possible but no later than Monday, March 23."[4]

6.     On March 12, 2020, the University further announced that all residential students were expected to leave campus "as soon as possible" for the remainder of the Spring 2020 semester, and certainly by the end of day on March 19, 2020, when residence halls would close.

7.     On March 19, the University reported to faculty, staff, and students that the entire campus would largely shut down the following day:

> While the University remains open and will continue to offer online instruction and essential services, **we expect to begin closing nearly all University buildings by 5 p.m. tomorrow (Friday, March 20)**.[5]

8.     As a result, since mid-March, Loyola students have been denied the bargained-for in-person instruction and access to facilities, technology, services, resources, and other benefits for which Plaintiff and Class members contracted when they paid Defendant tuition and mandatory fees for the Spring 2020 semester.

9.     Despite failing to hold any in-person classes since March 12, 2020, forcing students into online classes that are a shadow of the in-person instruction students and/or their families expected to receive and for which they paid, and denying students access to a wide range of on-campus services and benefits, Defendant has not refunded tuition or mandatory fees to Plaintiff and Class

---

[3] Loyola University Chicago – Message Sent To All Faculty, All Staff, All Students from the Office of the President, "Coronavirus (COVID-19) Update" (March 12, 2020, 8:24 am CT)
https://www.luc.edu/coronavirus/previousmessages/2020-0312-1-coronaviruscovid-19update.shtml (last visited May 26, 2020).
[4] *Id.*
[5] Loyola University Chicago – Message to All Faculty, All Staff, All Students "Campus Changes and Closures: COVID-19 Response Update" (March 19, 2020, 3:15 pm CT)
https://www.luc.edu/coronavirus/previousmessages/2020-0319-1-campuschangesandclosurescovid19responseupdate.shtml (last visited May 26, 2020).

3

members.

10.     The University reportedly received more than $10 million in government funding through the Coronavirus Aid, Relief, and Economic Security Act (CARES) Act, half of which is federally mandated to go toward students who are in need of emergency financial assistance.[6] Although the University received this influx of federal funds, Defendant refuses to refund or reimburse Plaintiff and the Class for any portion of the Spring 2020 tuition or most of the mandatory fees they paid for the in-person education and services that were no longer provided to Loyola students beginning in mid-March.

11.     Plaintiff and other Class members have lost the benefits of the education, services, extra-curricular opportunities, and other experiences that Defendant promised them.  Although it has failed to fulfill its obligations to students and their families, Defendant is currently unlawfully retaining and refusing to fully or partially refund Plaintiff's tuition and mandatory fees, despite the dramatically lower quality and less valuable education and services Defendant provided for the second half of the Spring 2020 semester.

12.     Essentially, Plaintiff and Class members paid Defendant for access to buildings and facilities that students were not permitted to enter, equipment and technology that they could not use, internships in which they could not participate, and much more. Additionally, Plaintiff and Class members paid Defendant for a quality of instruction, which, due to the abrupt shift to online learning, Defendant did not deliver. Defendant is thus profiting from COVID-19, asking students and their families—many of whom have been laid off, become ill, lost loved ones, or are

---

[6] Madison Savedra, "Loyola Will Receive Over $10 Million From Federal Government, Half of Which Is Dedicated to Student Aid", Loyola Phoenix (April 29, 2020 3:16 pm CT) http://loyolaphoenix.com/2020/04/loyola-will-receive-over-10-million-from-federal-government-half-of-which-is-dedicated-to-student-aid/ (last visited May 26, 2020).

otherwise suffering significantly—to bear the financial brunt of the pandemic. The result is an enormous windfall to Defendant. Both contract and equity demand that Defendant disgorge its ill-gotten funds.

13.     Plaintiff and similarly situated individuals are entitled to have Defendant disgorge in full the portions of their payments for unused services and to refund a significant portion of their tuition payments for substandard classes. Plaintiff brings this class action for injunctive, declaratory and equitable relief, and any other available remedies, resulting from Defendant's illegal, inequitable, and unfair retention of the funds paid by Plaintiff and the other individuals in the proposed Class.

14.     Specifically, this lawsuit seeks disgorgement and monetary damages in the amount of prorated, unused amounts of tuition and fees that Plaintiff and the other Class members paid, the benefits of which were not provided by Defendant, including the difference in value between the live in-person classes for which students enrolled compared to the lesser online versions of classes that Defendant has provided to them for the duration of the campus closure.

## II.     PARTIES

### A.     Plaintiff

15.     Plaintiff Andreea Gociman is a resident of Skokie, Illinois. During the 2019-20 academic year, Plaintiff's son was a second-year undergraduate student at Loyola University Chicago, where he is majoring in History.

### B.     Defendant

16.     Loyola University of Chicago is a private, not-for-profit corporation with its principal place of business is in Chicago, Illinois.

## III.     JURISDICTION AND VENUE

17.     This Court has original jurisdiction under 28 U.S.C. § 1332(d)(2)(A),

as modified by the Class Action Fairness Act of 2005, because the matter in controversy exceeds $5,000,000, exclusive of interests and costs, and because at least one member of the Class defined below is a citizen of a state other than California.

18.    This Court has personal jurisdiction over Defendant because Defendant maintains its principal place of business in this judicial District.

19.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1), because Defendant resides in this District and is a resident of the state in which the District is located.

## IV.    FACTUAL ALLEGATIONS

20.    Based in Chicago, Illinois, Loyola is a prestigious, private, Jesuit research university, offering more than 80 undergraduate majors and 140 graduate, professional, and graduate-level certificate program across 11 schools and colleges.

21.    In the 2020 edition of U.S. News & World Report's Best Colleges, Loyola was ranked the 104th in the best "National Universities" category. It also tied for 49th for "Best Undergraduate Teaching." Additionally, the University boasts that "[its] professional schools for business, law, and medicine are routinely ranked among the best in the nation."[7]

22.    The majority of Loyola programs and courses are offered on-campus. However, Loyola does offer seven adult degree completion programs, 21 graduate programs, and 18 certificate programs online.[8]

23.    Although Loyola markets its great value, the University is nonetheless

---

[7] Loyola University Chicago – "Begin Your Journey" Undergraduate and Graduate Student Admission, https://www.luc.edu/admission.shtml (last visited May 26, 2020).
[8] Loyola University Chicago – About Loyola Online, https://www.luc.edu/online/aboutloyolaonline/ (last visited May 26, 2020).

expensive. For the 2019-20 academic year, on-campus, full-time undergraduate students (those taking 12-21 credit hours per semester) paid $22,065 in tuition per semester, while part-time undergraduate students paid $814 per credit hour. Additionally, undergraduate students paid a dizzying array of mandatory fees, including but not limited to: a Student Development Fee ($419 per semester for full-time students), which largely funds student programs and services, clubs, and special events[9]; a Technology Fee ($125 per semester for full-time students), which funds, computer labs, software, student technology support, and more[10]; and a CTA U-Pass ($155 per semester), which is Loyola students' "ticket to unlimited riding aboard CTA buses and trains."[11] In addition, Loyola students paid a variety of mandatory course and supplies fees, and other miscellaneous fees.

24.     A full-time student in the Loyola School of Law paid $24,285 in tuition, plus mandatory fees, each semester during the 2019-20 academic year. In the Quinlan School of Business, a graduate student paid $4,488 in tuition per course or $92,064.00 for the Executive MBA program, plus mandatory fees.

25.     Before their COVID-19 closure, Loyola offered online bachelor's programs that cost significantly less than its on-campus program. Run through the School of Continuing and Professional Studies, Loyola's online bachelor's degree and certificate programs cost $693 in tuition per credit during the 2019-20 academic year.[12] Each semester, students enrolled in these online programs paid at most a $92

[9] Loyola University Chicago – Office Of The Bursar FAQs, https://www.luc.edu/bursar/faqs.shtml (last visited May 26, 2020).
[10] Loyola University Chicago – Technology Fee FAQs,
https://www.luc.edu/its/aboutits/itspoliciesguidelines/tech_fee_faq.shtml (last visited May 26, 2020).
[11] Loyola University Chicago – Office Of The Bursar – Graduation and Matriculation Fees (Undergraduate Student Graduation Fee and Graduate Student Matriculation Fee),
https://www.luc.edu/bursar/Matriculation_Fee.shtml (last visited May 26, 2020).
[12] Loyola University Chicago – Office Of The Bursar – School of Continuing and Professional Studies: Tuition & Fees 2019-2020, https://www.luc.edu/bursar/tuitionfees/2019-2020/scps/ (last visited May 26, 2020).

Student Development Fee and a $78 Technology Fee—both markedly lower than the fees charged for on-campus students.

26.     Loyola justifies its high cost for its on-campus programs, by touting "The Loyola Experience"—an integrated, hands-on education in the vibrant city of Chicago. "Your time at Loyola—**from the classes you take, to the people you meet, to the places you see**—will shape you for the rest of your life," the Loyola website proclaims.



27.     An integral part of the Loyola Experience is campus life. The majority of Loyola's in-person programs are offered at one of two Chicago campuses: (1) the University's main residential campus, Lake Shore Campus, "set along the shore of Lake Michigan on Chicago's North Side," and (2) the Water Town Campus, located in downtown Chicago, which is home to most of the University's graduate programs.

28.     Across these campuses, in-person students can participate in hundreds of clubs, ranging from honors to political organizations and hobby to spiritual groups. "With over 250 clubs and student-run organizations on campus, there's always someone to connect with, something to do, and somewhere to be. It's easy to meet new friends and make new connections inside—and outside—the classroom," the Loyola website states. Loyola also boasts an active Greek life, more

8

than 30 intramural and club sports, and more than 15 Division I sports.

29.     Additionally, Loyola advertises ample hands-on opportunities for students to work with one of the University's 495 community internship partners, or to otherwise serve the residents of Chicago.

> Our Loyola community isn't afraid to get its hands dirty cleaning up neighborhood parks and gardens—or use its expertise to mentor girls interested in STEM programs. They research local food deserts and volunteer with our student-run farmers market to make healthy food more accessible. Here, we don't talk about making the world a better place—we get to work.

30.     In fact, Loyola frequently stresses the opportunities—to volunteer, to intern, to explore, etc.—provided by the University's unique Chicago backdrop. The city is featured prominently across Defendant's marketing materials and is represented as a key component of students' Loyola Experience.

> Loyola and its students enjoy Chicago's exceptional cultural and economic resources. In addition to providing **an unparalleled setting for educational opportunities**, Chicago is also one of the most prestigious cities in the world in terms of recreation and entertainment.

> A hub of commerce and culture, **Chicago serves as an expanded campus for Loyola students**, offering a thriving economy,



impressive architecture, notable politicians, groundbreaking music, and innovative environmental policies.[13]

31.    In particular, the University's Water Town Campus, located in downtown Chicago, "place[s] students in the heart of the city, offering internship, networking, and career opportunities." In addition to internships and service opportunities, the city also provides students the chance to conduct research and fieldwork at major institutions.



32.    On-campus Loyola students also have access to a wide range of campus facilities. The Lake Shore Campus—which the University claims "helps make Loyola one of the most picturesque universities in the Midwest"—is home to over 40 buildings, including the Halas Recreation Center, Madonna della Strada Chapel, and Arnold J. Damen Student Center. Meanwhile, the Water Town Campus includes most graduate buildings, the Loyola University Museum of Art, and other facilities.

33.    In exchange for the promise of award-winning academic instruction, coupled with the robust on-campus activities, opportunities, services, and facilities detailed above, among others for her son, Plaintiff paid Defendant $22,065 in tuition for the Spring 2020 semester. Additionally, Plaintiff paid Defendant a $125 Technology Fee, a $50 Language Lab fee, and a $419 Student Development Fee.

---

[13] Loyola University Chicago – Loyola and Chicago (Academic Opportunities and About the City), https://www.luc.edu/about/chicago.shtml (last visited May 26, 2020).

Finally, in the fall of 2019, Plaintiff paid Defendant $530 for an annual parking permit for her son.

34.     Prior to the campus closure, Plaintiff's son regularly accessed resources and facilities on both the Lake Shore Campus and the Water Town Campus, where he was taking Economics classes at the Quinlan School of Business.

35.     Plaintiff's son has not attended any in-person classes since March 11, 2020. Instead, all of his classes moved online.

36.     Plaintiff's son has not used or accessed any campus facilities, used his CTA U-Pass, or parked his car on-campus since moving home—at Defendant's urging—on March 12, 2020.

37.     At the time of filing, Plaintiff has neither received nor been offered any refund or reimbursement for the tuition and fees that she paid for her son's on-campus education during the Spring 2020 semester.

38.     In fact, although Loyola has offered partial refunds for room and board charges, it has maintained that it will *not* issue refunds for tuition or most mandatory fees. Instead, the University has explained that it will partially credit Plaintiff and Class members *only* for the Student Development Fee, in the following manner:



39.     However, during the Spring 2020 semester, Loyola students lost out on much more than the events and clubs funded by this one fee. By paying tuition and

all mandatory fees, Plaintiff and Class members contracted and paid for Loyola students to receive the holistic, integrated, in-person, high-quality educational experience in the heart of Chicago which Loyola marketed and guaranteed to them. Since the campus closure and forced shift to online learning, Loyola students have not received such an education.

40.     First, when the campuses closed down, Defendant admitted that only "essential services" would continue, meaning that students lost access to nearly all of the technology, facilities, resources, services, activities, and other benefits covered by their tuition and fee payments. Yet, the University has *only* indicated that it will provide prorated refunds of the Student Development Fee. This fee "funds multiple programs and services for students," including "the Wellness Center, Halas membership, shuttle bus, and 8-ride programs;" the fee also provides "funding for clubs and organizations" and "a few special events organized by the students and administrators." By losing access to Loyola's campuses and being forced to move home, students lost out on much more.

41.     For example, students were denied access to computer labs and other services funded through the Technology Fee. For those who left Chicago, they also lost the ability to use their CTA U-Pass. Moreover, because Loyola does not charge a separate facilities fee, the use of campus buildings—including the libraries, the Halas Recreation Center, Madonna della Strada Chapel, and Arnold J. Damen Student Center, among many others—was included in the cost of tuition. Thus, when Defendant closed its campuses, it denied Loyola students access to in-person resources and facilities for which Plaintiff and Class members had paid.

42.     In addition to being denied tangible benefits, Loyola students were forced into online "classes" that were nowhere close in quality to the on-campus courses in which they had enrolled for the Spring 2020 semester. Rather, these

classes were watered-down, overpriced substitutes that were shoehorned at the last minute into an online format. Although all students, who paid the same price for their campus educational experience received lower quality of instruction, disciplines where in-person instruction is critical, such as dance, music, engineering, lab-based science courses, in particular were of markedly and obviously lower quality and usefulness to students.

43.     The University did not provide a clear answer on how courses that required specific facilities would continue. In an FAQ, in response to the question, "How will classes that require specific facilities such as labs or studios continue online?" the University simply advised students of the following: "You can discuss this with your professor. Individual instructors will be working with their classes to find alternatives to in-person lab or studio components." That is, although Loyola charged all students the same tuition, the University put the burden on students and faculty to find "alternatives," without providing support—or refunds—if and when those alternatives were inadequate.

44.     Courses involving clinical placements and internships were also difficult, if not impossible, to recreate online. For students "participating in clinicals, internships, and other placement-based courses, such as service-learning, research, and fieldwork" during the Spring 2020 semester, the University provided the following "guidelines":

> If placement-based sites are open and running, and students will still be in the Chicago-area, placements can proceed as usual. Academic units may also make decisions regarding students' participation in these learning activities.
>
> If placement sites are open but students are being sent home from campus, **faculty are encouraged to move to alternative activities/assessments** as posted on the Academic Continuity/Engaged Learning webpage. **Alternatively, faculty can make the decision that**

**work already completed by students satisfies the requirements for credit**. Faculty should be flexible in their expectations and give high priority to seniors completing their degree requirements in the Spring 2020 semester.

If placement sites have been closed, **faculty are encouraged to move to alternative activities/assessments** as posted on the Academic Continuity/Engaged Learning webpage. **Alternatively, faculty can make the decision that work already completed by students satisfies the requirements for credit**. Faculty should be flexible in their expectations and give high priority to seniors completing their degree requirements in the Spring 2020 semester.[14]

45.     In other words, many Class members contracted and paid for hands-on, experiential learning experiences for Loyola students, but, as placement-sites closed down, students (1) were transitioned into subpar "alternatives activities/assessments" or (2) had their experiences cut short entirely by nearly two months. Even if faculty concluded that students work "satisfie[d] the requirements for credit," students did *not* get the experience for which Class members paid: a full semester of face-to-face, real-world experience through clinicals, internships, service-learning, research, or other fieldwork.

46.     In fact, for *all* courses—no matter their nature—students did not get the education that Plaintiff and Class members had bargained for. Below is a revealing question and response from an FAQ posted by the University:

**Will my child be getting the same level of academic instruction through online classes?** Every effort has been made to ensure a smooth transition to online learning, and our faculty are being supported with training, resources, and tools to conduct their lessons online.

47.     That is, for families wondering if their children would get the academic

---

[14] Loyola University Chicago – Frequently Asked Questions – Coronavirus, https://www.luc.edu/coronavirus/faqs/index.cfm (last visited May 26, 2020).

instruction for which they had bargained, the University could not answer with a simple and resounding "yes." Instead, Defendant offered only vague hedging, including an admission that faculty were only being trained as they were teaching students at the same time.

48.     The reality is that Defendant's efforts were not enough, and that Loyola students did not get the same level of academic instruction through online classes. For example, Plaintiff's son—who was enrolled in six courses, for a total of 18 credit hours, during the Spring 2020 semester—experienced immense challenges as his courses transitioned online and his professors, many of whom had no training or experience in virtual instruction, struggled to adapt. In particular, his upper-level, conversational foreign language class simply could not be recreated over Zoom. Making matters worse, the professor refused to alter the course in any way for remote delivery. That instructor also failed to communicate clear expectations and deadlines to students. By the end of the semester, communication had broken down to the point that the professor alerted Plaintiff's son and his classmates, for the first time, that they had a final just two days before it was administered.

49.     As Plaintiff's son story indicates, Loyola courses and faculty failed to successfully shift to online instruction – and this failure was pervasive. In an email to Loyola faculty on February 28, 2020, the University all but admitted this fact in discussing that online courses might be imminent:

> One possibility is that we might not be able to hold in-person classes. In this event, **we would move as many of our classes as possible to an online format**. To this end, we ask that over spring break you give some thought to how you might be able to transition your course to an online format.[15]

---

[15] Loyola University Chicago –Message Sent To All Faculty, All Staff, All Students from Office of Provost, (February 28, 2020, 2:41 pm CT) https://www.luc.edu/coronavirus/previousmessages/2020-0228-1-preparednessforpossiblecoronavirus-relateddisruptionofclasses.shtml (last visited May 26, 2020).

50.     The University thus confirmed that it would not be "possible" for *all* classes to move online. In fact, prior to the March 2020 campus closure, Defendant indicated that *most* of its programs could not be delivered remotely, at least not to the University's usual standards. Rather, Defendant had previously only offered seven adult degree completion programs, 21 graduate programs, and 18 certificate programs online. By providing such limited online offerings, Defendant acknowledged that it was not in a position to successfully deliver all of its programs online. Yet, after abruptly closing its campus in mid-March 2020, Defendant forced *all* students into online courses, no matter how inappropriate many courses might have been for such a format.

51.     Finally, and perhaps most significantly, the courses and programs which Defendant previously offered online—which were designed specifically for virtual delivery—were significantly less expensive than the on-campus offerings for which Plaintiff and Class members paid. For example, in the 2020 Spring semester, a student enrolled in 12 credits of online courses in a bachelor's degree or certificate program in Defendant's School of Continuing and Professional Studies would pay $8,316 in tuition. Meanwhile, an undergraduate student taking the same number of credits on-campus would pay $22,065 in tuition—**more than 265% more**.

52.     Plaintiff and Class members thus paid a significant premium for Loyola students to receive on-campus instruction, and the resources and opportunities that went along with it. But, after the haphazard shift to online learning, which was unsuitable for many courses, Loyola's on-campus students in fact received *less* than their online peers. While online Loyola students paid far less in tuition and fees, they received award-winning instruction in courses appropriate and designed for virtual delivery. Meanwhile, Plaintiff and Class members paid more in tuition and fees, and yet, since mid-March 2020, Loyola's on-campus students received bubble gum and

duct-tape Zoom lectures and meetings thrown together at the last minute.

53.     The tuition and fees that Defendant charged Plaintiff and the Class for on-campus courses were higher than those for online courses because they were meant to cover the holistic, on-campus experience that Loyola marketed:

> Here, you will explore what interests you, pursue your passions, and leave transformed. **It's about more than what classes you'll take. It's the research opportunities, the internships, the exploration in the city (or not in the city), and the time you spend with friends**. Your time here will prepare you to launch your career with confidence.

54.     The fees and tuition that Plaintiff and the Class paid to Defendant were thus predicated on students' ability to: have constant, face-to-face interaction with and feedback from peers, mentors, professors, and guest lecturers; use technology, libraries, laboratories, and studios; conduct research; complete real-world clinics and internships; develop independence; build a professional network; explore the "expanded campus" the city of Chicago; and make friends, among other things.

55.     Plaintiff and Class members paid a premium for on-campus courses, and the unique benefits which were supposed to come with those in-person courses. By abruptly closing the University in March 2020, transitioning all in-person classes to online teaching, sending students home, and significantly reducing resources and opportunities available to students, Loyola simply failed to deliver the educational services, facilities, technology, activities, and other resources for which Plaintiff and Class members contracted and expected to receive. Plaintiff and the proposed Class are therefore entitled to a prorated refund of tuition and fees for the duration of Loyola's COVID-19-related closure for the education and services that Defendant did not provide, or which Defendant provided in a severely diminished manner.

56.     Through this lawsuit, Plaintiff seeks—for herself and the other Class members—Defendant's disgorgement and/or refund of (i) the prorated, unused

portion of mandatory fees, proportionate to the amount of time that remained in the Spring 2020 semester when the campus was shut down, classes moved online and campus services ceased being provided in full; and/or (ii) a refund of a percentage of tuition based on students no longer being able to attend classes in-person and instead being offered a far inferior online learning experience.

## V.  CLASS ACTION ALLEGATIONS

57.    Pursuant to Fed. R. Civ. P. 23(a), (b)(2), (b)(3), and/or (c)(4), Plaintiff brings this action on behalf of herself and the following Class:

> All persons who (i) paid tuition, mandatory fees, and/or other costs to Loyola University Chicago for an in-person class or classes to be conducted during the Spring 2020 semester and/or subsequent terms, and (ii) did not receive the in-person education for which they paid.

58.    A class action is a superior means to ensure the fair and efficient adjudication of this case.  The damages suffered by individual Class members are relatively small compared to the burden and expense of individual litigation of the claims described herein against Defendant. Moreover, individualized actions would run the risk of creating inconsistent or contradictory judgments arising from the same set of facts and would increase the likely delay and expense to all parties involved and the Court itself.  By contrast, by proceeding as a class action, the claims at issue can be adjudicated efficiently through economies of scale.

59.    **Numerosity.**  In accordance with Fed. R. Civ. P. 23(a)(1), the members the proposed Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable.  Although the precise number of Class members is unknown presently to Plaintiff, the Class is presumed to number more than 17,000 people and is easily ascertainable through enrollment and financial records maintained by Defendant.

60.    **Commonality and Predominance.**  In accordance with Fed. R. Civ. P

23(a)(1) and (b)(3), this action involves questions of law and fact common to the Class that predominate over any individual questions specific to any Class member. These include:

    a.  whether Defendant accepted money from the Class;

    b.  whether Defendant retained money from the Class for services it did not render, or only partially rendered;

    c.  whether Defendant entered into a contract with the Class;

    d.  whether Defendant breached its contract with the Class;

    e.  whether Defendant benefitted from the money it accepted from the Class;

    f.  whether the educational and other services Defendant provided to the Class were commensurate with their value;

    g.  whether certification of the Class is appropriate under Fed. R. Civ. P. 23;

    h.  whether Class members are entitled to declaratory, equitable, or injunctive relief, and/or other relief; and

    i.  the amount and nature of relief to be awarded to Plaintiff and the other Class members.

61. **Typicality.** Pursuant to Fed. R. Civ. P. 23(a)(3), Plaintiff's claims are typical of the other Class members' claims because Plaintiff and the other Class members each paid for tuition costs associated with the Spring 2020 semester but were not provided the services that those costs were meant to cover. Each suffered damages in the form of their lost tuition and other monies paid to Defendant, and the claims all arise from the same Loyola University Chicago practices and course of conduct. There are no defenses available that are unique to the Plaintiff.

62. **Adequacy of Representation.** In accordance with Fed. R. Civ. P 23(a)(4), Plaintiff is an adequate Class representative because her interests do not conflict with the interests of the other proposed Class members. Moreover, Plaintiff

has retained counsel competent and experienced in complex class action litigation, and she intends to prosecute this action vigorously on behalf of her fellow Class members. Plaintiff has no interests that are antagonistic to those of the Class and she will fairly and adequately protect the proposed Class' rights along with counsel.

<u>**COUNT I**</u>

**Breach of Contract**

63.     Plaintiff repeats and alleges the allegations in Paragraphs 1-62, above, as if fully alleged herein.

64.     Plaintiff brings this claim individually and on behalf of the other members of the Class.

65.     Plaintiff and the other members of the Class entered into binding contracts with Loyola University Chicago through Defendant, for which Defendant was the direct beneficiary, which provided that Plaintiff and the other members of the Class would pay tuition and fees, to Defendant, in exchange for on-campus educational, extra-curricular, and social facilities and experiences.

66.     These contracts were formed by multiple documents when students bid by formally registering for courses offered by Defendant, in light of the quoted tuition and fees pertaining to such registration, and Defendant thereafter accepted those bids, or registrations, by sending bills for tuition and fees to Plaintiff and Class members. At this time, written contracts arose.

67.     As part of their contracts with the University, and, in exchange for adequate consideration that Plaintiff and members of the proposed Class provided, Defendant promised to provide on-campus educational services to Plaintiff and Class members.

68.     Ever since closing its campus in mid-March 2020, Defendant has failed to provide the services that it was obligated to perform under its contracts with

Plaintiff and the proposed Class. Defendant has retained tuition and fee payments paid by Plaintiff and the other members of the Class without providing them the promised benefits.

69.     By contrast, Plaintiff and the other members of the Class fulfilled their end of the bargain when they paid the monies due and owing for their full tuition and fees.

70.     The tuition and fee payments that Plaintiff and the proposed Class paid were intended to cover in-person educational and extra-curricular services. Defendant, however, has improperly retained the funds Plaintiff and the proposed Class paid without providing them the services and other benefits due under the contracts.

71.     Plaintiff and members of the Class have suffered damages as a direct and proximate result of Defendant's breach, including being deprived of the education, experience, and services that they were promised and expected to obtain, and for which they have paid.  They are entitled to damages including but not limited to prorated reimbursement of the tuition, fees, and other expenses that were collected by Defendant for services that Defendant failed to deliver fully.

72.     Defendant's performance under the contracts is not excused because of COVID-19. Even if performance was excused or impossible, Defendant would nevertheless be required to return the funds received for services and/or goods that it did not provide.

## COUNT II

### Restitution Based On Quasi-Contract

73.     Plaintiff repeats and allege the allegations in Paragraphs 1-72, above, as if fully alleged herein.

74.     Plaintiff brings this claim individually and on behalf of the other

members of the Class in the alternative to the breach of contract claim brought in Count I.

75. Plaintiff and other members of the proposed Class conferred a benefit or enrichment on Defendant by paying tuition and fees to Defendant, which was beneficial to Defendant, at the expense of Plaintiff and the other members of the Class.

76. Plaintiff and the other members of the Class paid tuition and fees and did not receive the full benefit of their bargain from Defendant, thus resulting in their impoverishment.

77. Defendant has retained the benefit paid by Plaintiff and the Class despite its failure to provide the services for which the benefit was paid.

78. There is no justification or cause for Defendant's failure to return the portion of the tuition and fees that Defendant has unjustifiably kept for itself even though it failed to complete the services for which Plaintiff and the Class provided the funds to Defendant.

79. Accordingly, Defendant has been unjustly enriched and should pay as restitution a prorated portion of the funds that Plaintiff and the proposed Class paid for tuition and fees for the duration of the campus closure.

## COUNT III

### Conversion

80. Plaintiff repeats and re-alleges the allegations in Paragraphs 1-79, above, as if fully alleged herein.

81. Plaintiff brings this claim individually and on behalf of the Class.

82. Plaintiff and the other members of the Class have a right to the in-person educational and extra-curricular services that they were supposed to be provided in exchange for their payments to Defendant.

83. Defendant intentionally interfered with the rights of Plaintiff and the other members of the proposed Class when it retained payments intended to pay for on-campus classes, facilities, and activities, while moving all classes to an online, remote learning format and discontinued or services and access to facilities for which Plaintiff and the members of the proposed Class had paid.

84. Defendant deprived Plaintiff and the other members of the Class of their tuition and fee payments or of the right to the services for which their payments were intended to be used.

85. Class members demanded the return of the prorated, unused tuition and fee payments for the duration of the campus closure.

86. Defendant's retention of the tuition and fees paid by Plaintiff and the other members of the Class without providing the services for which they paid deprived Plaintiff and the other members of the Class of the benefits for which the payments were paid. This interference with the services for which Plaintiff and the other members of the Class paid damaged Plaintiff and the other members of the Class in that they paid for services that were not and will not be provided.

87. Plaintiff and the other members of the Class are entitled to the return of prorated unused portion of the tuition and fees paid, through the end of campus closure and forced transition to online learning.

## VI. **PRAYER FOR RELIEF**

88. Plaintiff, individually and on behalf of the members of the Class, respectfully requests that the Court enter judgment in their favor and against Defendant as follows:

a. Certifying the Class as requested herein, designating Plaintiff as Class representative, and appointing the undersigned counsel as Class Counsel;

b.     Declaring that Defendant is financially responsible for notifying the Class members of the pendency of this suit;

c.     Declaring that Defendant wrongfully kept the monies paid by the Class;

d.     Awarding injunctive relief and restitution as permitted by law or equity;

e.     Awarding Plaintiff's reasonable attorneys' fees, costs, and expenses;

f.     Awarding pre- and post-judgment interest on any amounts awarded; and

g.     Awarding such other and further relief as the Court deems just and proper.

## VII.   <u>DEMAND FOR JURY TRIAL</u>

Plaintiff demands a trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure on all causes of action so triable.

Dated:  May 26/, 2020

                                 Respectfully submitted,
                                 <u>/s/ Elizabeth A. Fegan</u>
                                 Elizabeth A. Fegan
                                 Fegan Scott LLC
                                 150 S. Wacker Dr., 24th Floor
                                 Chicago, IL 60606
                                 Tel: (312) 741-1019
                                 Email: beth@feganscott.com

                                 Shanon J. Carson*
                                 Ellen T. Noteware*
                                 BERGER MONTAGUE PC
                                 1818 Market Street, Suite 3600
                                 Philadelphia, PA 19103
                                 Tel: (215) 875-3000
                                 Email: scarson@bm.net
                                 Email: enoteware@bm.net

E. Michelle Drake*
BERGER MONTAGUE PC
43 Southeast Main Street, Suite 505
Minneapolis, MN 55414
Tel: (612) 594-5999
Email: emdrake@bm.net

*pro hac vice forthcoming

Attorneys for Plaintiffs and the Class