## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| ANDREEA GOCIMAN, SIMON PFEIFER, ISABEL BOTELLO, and JOSEPH HICKEY, KARI WHALEN, Individually and on Behalf of All Others Similarly Situated, | Case No. 20-cv-03116 |
| | Honorable Robert W. Gettleman |
| Plaintiffs, | |
| v. | **AMENDED CLASS ACTION COMPLAINT** |
| LOYOLA UNIVERSITY OF CHICAGO, | **(1) BREACH OF CONTRACT; and** |
| Defendant. | **(2) UNJUST ENRICHMENT;** |
| | JURY TRIAL DEMANDED |

Plaintiffs Andreea Gociman, Simon Pfeifer, Isabel Botello, Joseph Hickey, and Kari Whalen ("Plaintiffs"), individually and on behalf of all other similarly situated individuals, bring this class action complaint against the Loyola University of Chicago ("Loyola," the "University" or "Defendant"). Plaintiffs make the following allegations upon personal knowledge as to their own acts and upon information and belief and their attorneys' investigation as to all other matters.

## I.     NATURE OF THE ACTION

1.     This action is brought on behalf of students and parents of Loyola University of Chicago who seek a fair adjustment of the top-dollar tuition and fees that Defendant retains despite the termination of in-person instruction, and the loss of related access, benefits, and services in the middle of the Spring 2020 semester due to the Coronavirus Disease 2019 ("COVID-19") pandemic.

2.     As set forth more fully below, during the Spring 2020 semester, Plaintiffs and other similarly situated individuals ("the Class") contracted with Defendant for certain services; namely,

a full semester's worth of live, on-campus instruction, along with access to campus facilities, communities, events, and other resources.

3.      Plaintiffs and Class members upheld their end of the bargain, collectively paying Defendant millions of dollars in tuition and mandatory fees.

4.      However, just over halfway into the Spring 2020 semester, Defendant abruptly denied Plaintiffs and Class members the on-campus instruction and campus resources for which they had contracted. On March 13, 2020, Defendant suspended all in-person classes.[1] On March 19, 2020, barring exceptional circumstances, Defendant evicted Loyola students from on-campus housing.[2] At 5 p.m. on March 20, 2020, Defendant closed "nearly all University buildings" to Loyola students.[3]

5.      As a result, Plaintiffs and the Class did not receive the full semester's worth of in-person education and on-campus benefits for which they bargained.

6.      Plaintiffs and the Class therefore seek damages in the form of tuition and fee refunds for the period during which they were denied in-person, on-campus instruction and access to campus facilities and resources.

## II.    PARTIES

### A.    Plaintiffs

7.      Plaintiff Andreea Gociman ("Plaintiff Gociman") is a resident of Cocoa Beach, Florida. She is the mother of Plaintiff Simon Pfeifer and was responsible for paying his tuition and fees, which were unique to his enrollment in an on-campus program at Loyola, during the Spring 2020 semester. Specifically, for her son's on-campus studies during the Spring 2020 semester, Plaintiff Gociman paid Defendant $22,065 in tuition, a $125 Technology Fee, a $419 Student

---

[1] https://www.luc.edu/coronavirus/previousmessages/2020-0312-1-coronaviruscovid-19update.shtml (last visited August 28, 2020).

[2] *Id.*

[3] https://www.luc.edu/coronavirus/previousmessages/2020-0319-1-campuschangesandclosurescovid19responseupdate.shtml (last visited August 27, 2020).

Development Fee, a $155 CTA U-Pass Fee, and a $50 Language Lab fee. Finally, in the fall of 2019, Plaintiff Gociman paid Defendant $530 for an annual parking permit for her son.

8.    Plaintiff Simon Pfeifer ("Plaintiff Pfeifer") is a resident of Cocoa Beach, Florida. During the 2019-2020 academic year, Plaintiff Pfeifer was a second-year, full-time undergraduate student at Loyola, where he is majoring in History. During the Spring 2020 semester, Plaintiff Pfeifer registered specifically and exclusively for Loyola's in-person, on-campus courses. Prior to the campus closure, Plaintiff Pfeifer regularly accessed resources and facilities, including gyms, libraries, and parking facilities, and also participated in a fraternity.

9.    Plaintiff Isabel Botello ("Plaintiff Botello") is a resident of Itasca, Illinois. During the 2019-2020 academic year, Plaintiff Botello was a second-year, full-time undergraduate student at Loyola, where she is majoring in Psychology. During the Spring 2020 Semester, Plaintiff Botello registered specifically and exclusively for Loyola's in-person, on-campus courses. Prior to the campus closure, Plaintiff Botello frequently used the Loyola campus library, as she did not have wireless internet at home. She also used the campus gym multiple times each week. In exchange for her on-campus studies during the Spring 2020 semester, Plaintiff Botello paid Defendant $22,065 in tuition, a $125 Technology Fee, a $419 Student Development Fee, and a $155 CTA U-Pass Fee, which required her to take out loans. In the fall of 2019, she also paid Defendant $530 for an annual parking permit.

10.    Plaintiff Joseph Hickey ("Plaintiff Hickey") is a resident of Orland Park, Illinois. He is the father of a current senior undergraduate pre-med student at Loyola, and was responsible for paying her tuition and fees, which were unique to her enrollment in an on-campus program at Loyola, during the Spring 2020 semester. Specifically, for his daughter's on-campus studies during the Spring 2020 semester, Plaintiff Hickey paid Defendant $13,925.00 in tuition, a $60 technology fee, a $50 German Lab fee, a $120 Physics Science Lab Fee, a $309 Student Development Fee, and a $155 CTA U-Pass Fee.

11.    Plaintiff Kari Whalen ("Plaintiff Whalen") is a resident of Morris, Illinois. During

3

the 2019-2020 academic year, Plaintiff Whalen was a senior, full-time undergraduate student at Loyola, where she majored in Criminal Justice/Criminology and Psychology. During the Spring 2020 Semester, Plaintiff Whalen registered specifically and exclusively for Loyola's in-person, on-campus courses. Prior to the campus closure, Plaintiff Whalen regularly accessed resources and facilities, and in fact used the campus gym nearly every day. She also worked at the gym as a manager—a job which she lost when Defendant closed its campuses, thus causing Plaintiff Whalen to lose her only source of income. In exchange for her on-campus studies during the Spring 2020 semester, Plaintiff Whalen paid Defendant $22,065 in tuition, a $125 Technology Fee, a $419 Student Development Fee, and a $155 CTA U-Pass Fee.

      **B.**    <u>**Defendant**</u>

12.    Loyola University of Chicago is a private, not-for-profit corporation with its principal place of business is in Chicago, Illinois.

## III.   <u>JURISDICTION AND VENUE</u>

13.    This Court has original jurisdiction under 28 U.S.C. § 1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005, because at least one Class member is of diverse citizenship from one Defendant, there are more than 100 Class members, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, and costs.

14.    This Court has personal jurisdiction over Defendant because Defendant maintains its principal place of business in this judicial District.

15.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1), because Defendant resides in this District and is a resident of Illinois.

## IV.   <u>FACTUAL ALLEGATIONS</u>

      **A.**    **Background**

16.    Loyola University markets itself to students as a diverse community that offers students opportunities beyond the classroom to connect, learn, and engage. It is those shared experiences and co-curricular activities that the University claims differentiate it from other

institutions and justify its high cost.

17.    Like other residential colleges and universities, Loyola does not merely sell credit hours and diplomas in exchange for money, as one would sell some common consumer commodity. Rather, Defendant sells an educational experience based on specific services, including live, in-person classes and access to campus facilities, events, opportunities, resources, and a rich tapestry of co-curricular experiences.

18.    Founded in 1870 and now based in Chicago, Illinois and the surrounding area, Loyola is a prestigious, private, Jesuit research university. Loyola caters to both undergraduate and graduate students, offering over 80 undergraduate majors in fields ranging from chemistry to dance, and over 140 graduate, professional, and graduate-level certificate programs, across 11 schools and colleges.

19.    In 2018, Loyola enrolled nearly 12,000 undergraduates and roughly 5,000 graduate students, for a total enrollment of more than 17,000.

20.    In 2019, Loyola had an endowment of more than $800 million.[4]

21.    Loyola is considered a top-tier higher education institution, ranking 104th in the best "National Universities" category of the 2020 edition of U.S. News & World Report's Best Colleges."

**B.    Before Spring 2020, Loyola Offered—and Distinguished Between— On-Campus and Online Programs**

22.    Like many traditionally residential colleges and universities across the United States, for the 2019-2020 school year, Loyola offered the vast majority of its programs on-campus but offered a few online options, as well.

23.    After establishing its first online Computer Science program in 1998, Loyola now offers seven adult degree completion programs, 21 graduate programs, and 18 certificate programs online.[5]

---

[4] https://www.luc.edu/media/lucedu/finance/pdfs/fy19_financial_statements.pdf (last visited August 29, 2020).
[5] https://www.luc.edu/online/aboutloyolaonline/ (last visited August 29, 2020).

24.     Loyola's on-campus and online options for the 2019-2020 school year were not interchangeable. Instead, depending on whether a student contracted for an in-person program or an online one, Defendant provided an entirely different experience and set of services.

25.     The distinctions were apparent at every step. For example, Defendant marketed its online programs—collectively referred to as "Online Learning at Loyola"—through both a unique website[6] and course catalog.[7]

26.     Perhaps the greatest differences were in the format in which Defendant delivered instruction and resources depending on whether a student enrolls in an on-campus or online program – and the price Loyola charged for those services.

27.     For students who enrolled in one of Defendant's many traditional, in-person, on-campus programs, Defendant delivered 100% of the courses in-person at one of its physical campuses, as described in greater detail below. Notably, Defendant routinely acknowledges that certain classes—"includ[ing] labs, experiential learning classes, and research"—"require[e] face-to-face interaction" and thus can *only* be taught in-person.[8] It is no doubt for this reason that, prior to COVID-19, the majority of Defendant's undergraduate and graduate programs were offered exclusively on-campus, with no on-line option.

28.     Meanwhile, for students who enrolled in Online Learning at Loyola, Defendant provided instruction using a mix of online, hybrid, and blended courses. Online courses are those that require "no face-to-face meetings on campus," hybrid courses are those where "at least 75% of the course is delivered online," and blended courses are those where between 30 and 75% of the course is delivered online.[9] Given the format of these classes, Defendant has historically offered only a fraction of its overall academic offerings online.

29.     Loyola charged markedly different tuition and fee for online programs as opposed

[6] https://www.luc.edu/online/index.shtml (last visited August 29, 2020).
[7] https://lucapps.luc.edu/online/course.htm (last visited August 29, 2020).
[8] https://www.luc.edu/coronavirus/faqs/index.cfm (last visited August 29, 2020).
[9] https://www.luc.edu/online/online_definitions.html (last visited August 29, 2020).

to on-campus ones.[10]

30.     For the 2019-2020 academic year, Defendant charged on-campus, full-time[11] undergraduate students $22,065 in tuition per semester, or between $1,050.71 and $1,838.75 per credit hour.[12] Additionally, Defendant charged these students an array of mandatory fees, including but not limited to: a Student Development Fee ($419 per semester for full-time students), which largely funds student programs and services, clubs, and special events[13]; a Technology Fee ($125 per semester for full-time students), which funds, computer labs, software, student technology support, and more[14]; and a CTA U-Pass ($155 per semester), which is Loyola students' "ticket to unlimited riding aboard CTA buses and trains."[15] In addition, Loyola students paid a variety of mandatory course and supplies fees, and other miscellaneous fees.

31.     Loyola charged  students enrolled in online bachelor's and certificate programs far lower amount of tuition and fees -- merely $693 in tuition per credit.[16] Defendant also charged these online undergraduate students far fewer fees -- *no* CTA U-Pass fee whatsoever and, at most, a $92 Student Development Fee and a $78 Technology Fee—both markedly lower than the corresponding fees charged for on-campus students.

32.     These differences in tuition and mandatory fee charges reflect the fact that Loyola students who enroll in on-campus programs have access to facilities, events, activities, and other resources—coupled with face-to-face, live instruction—that are simply unavailable to those who instead opt to pursue their degrees online.

---

[10] https://www.luc.edu/bursar/tuitionfees/ (last visited August 29, 2020).

[11] Those taking 12-21 credit hours per semester; *see* https://www.luc.edu/bursar/tuitionfees/2019-2020/undergraduate/ (last visited August 28, 2020).

[12] Part-time, on-campus undergraduate students were charged $814 in tuition per credit hour and fees based on how many credits in which they were enrolled. https://www.luc.edu/bursar/tuitionfees/2019-2020/undergraduate/ (last visited August 29, 2020).

[13] https://www.luc.edu/bursar/faqs.shtml (last visited August 29, 2020).

[14] https://www.luc.edu/its/aboutits/itspoliciesguidelines/tech_fee_faq.shtml (last visited August 28, 2020).

[15] https://www.luc.edu/upass/aboutu-pass/ (last visited August 29, 2020).

[16] https://www.luc.edu/bursar/tuitionfees/2019-2020/scps/ (last visited August 29, 2020).

7

> **C.    Plaintiffs Contracted with Defendant for In-Person, Face-to-Face Classes and Access to Campus Facilities, Resources**

33.    Against this backdrop, and despite the relatively high costs to them and their families, Plaintiffs Pfeifer, Botello, and Whalen each enrolled in an *on-campus* program at Loyola for the Spring 2020 semester. In doing so, and unlike students enrolled in Online Learning at Loyola, they contracted with Defendant specifically for courses that would be delivered 100% on-campus, and for the many in-person resources and services that go along with them.

34.    That is, they and other similarly situated students contracted for the on-campus "Loyola Experience" that Defendant marketed to them.







35.    An integral part of the on-campus Loyola Experience is campus life. Indeed, and as the two screenshots bellow illustrate, the navigation on Defendant's website for on-campus programs prominently features an entire section titled "Campus Life"—a section that does not

exist on the navigation for Defendant's website for its online programs.

36.     For example, Defendant advertises that, across its two campuses—the Lake Shore Campus, the University's main residential campus, and the Water Town Campus, which is home to most of Defendant's graduate programs—in-person students can participate in hundreds of clubs, ranging from honors to political organizations and hobby to spiritual groups. "With **over 250 clubs and student-run organizations on campus**, there's always someone to connect with, something to do, and somewhere to be. It's easy to meet new friends and make new connections



inside—and outside—the classroom," Defendant's website for on-campus programs states.[17] Defendant also boasts an active Greek life, more than 30 intramural and club sports, and more than 15 Division I sports.

37.     Loyola's website indicates that the University's core mission involves offering its on-campus students "essential" co-curricular involvement and experiences "beyond the classroom:"

**University Mission**

We are Chicago's Jesuit Catholic University -- a diverse community seeking God in all things and working to expand knowledge in the service of humanity through learning, justice, and faith.

**Student Activities & Greek Affairs Mission**
The mission of Student Activities & Greek Affairs is to offer opportunities for students to connect, learn, and engage beyond the classroom.  Through shared experiences students gain a greater sense of self and community to foster positive social change.

---

[17] https://www.luc.edu/undergrad/featurecontent/canvases/residencelife/ (last visited August 29, 2020).

**Philosophy Statement**
We believe co-curricular involvement is an essential part of Loyola University Chicago. It provides students with a variety of opportunities to explore their interests across a multitude of disciplines and fields. Through a model of challenge and support, we are committed to helping students develop into strong leaders and positive agents of social change.

38. Additionally, Loyola represents that its on-campus Loyola students have access to a wide range of campus facilities, including the Halas Recreation Center, Madonna della Strada Chapel, Arnold J. Damen Student Center, and the Loyola University Museum of Art.

39. Moreover, across the website for Loyola's on-campus programs, Defendant routinely highlights the many unique benefits of enrolling in an in-person, rather than online, program.

Here, you will explore what interests you, pursue your passions, and leave transformed. **It's about more than what classes you'll take. It's the research opportunities, the internships, the exploration in the city (or not in the city), and the time you spend with friends**. Your time here will prepare you to launch your career with confidence.[18]

40. Altogether, on-campus facilities, services, opportunities, and resources are so critical to the Loyola Experience that the University *requires* full-time first-year and second-year students to live in campus housing. "**As a residential campus committed to the education of the whole person, the residential experience is considered an integral part of a student's education and the Loyola Experience**," Defendant proclaims in its description of the "Residency Requirement." *See* Exhibit A.[19] Per this requirement, as set out in Defendant's 2019-2020 Community Standards, "All full-time first-year and second-year students are required to live in Loyola University Chicago Residence Life housing and purchase a meal plan. Typically, this requirement requires four semesters of residency in Loyola's residence halls (not including summer terms)." *See* Exhibit B.

41. As the Residency Requirement itself demonstrates, Defendant does not just *market*

---

[18] https://www.luc.edu/undergrad/letsgetstarted/freshman/ (last visited August 29, 2020).

[19] Also available at https://www.luc.edu/reslife/about/residencyrequirement/(last visited August 29, 2020).

its on-campus programs and the in-person education and countless resources that go along with them. Instead, for students who enroll in Defendant's full-time, on-campus programs—including Plaintiffs Pfeifer, Botello, and Whalen and Class members—promises of on-campus instruction and access to facilities and resources are part of the contractual agreement between them and Defendant.

42.     Indeed, Defendant recognizes that it enters into contractual agreements with students. At the start of each semester, Loyola students enroll in classes through an on-line portal called "LOCUS." On LOCUS, Loyola students select the classes for which they will register each term. When students are choosing their classes, students search for classes by subject matter, meeting time, meeting day, instructor, campus, location, and mode of instruction. *See* Exhibit C.

43.     Before a student registers for a class through LOCUS, a student can click on links detailing information about the class format, syllabus and textbooks and materials used in the class. LOCUS includes a description of each class and notes about how the course will be taught, including whether there are service-learning or other in-person requirements.

44.     After choosing classes in LOCUS, Loyola requires students to click a button indicating that they accept financial responsibility for paying for the specific classes for which they enrolled.

45.     The Financial Responsibility Disclaimer that Loyola requires its students to sign indicates that there is an agreement between the student and Loyola. It states that in order for a student to enroll in classes at the University, the student must click the "I Accept" button. Recognizing that by doing so Loyola has entered a contractual binding agreement with the student, the Financial Responsibility Disclaimer requires a student to "only be required to do so once per term, unless **the terms of the agreement** are altered by the university between the time that you start enrolling for that term and your completion of that process."

46.     On information and belief, the Financial Responsibility Disclaimer Plaintiffs and other Loyola students signed before the start of the 2020 Spring semester indicated that the student

11

was responsible for paying all tuition and other fees associated with *the classes in which they enrolled*. Each student agrees that Loyola can impose a 1.5% monthly late fee and place the student's account with a collection agency if the student's account is past due. The student is responsible for paying all fees and costs incurred by Loyola for collection of past due amounts. If an account is past due, Loyola blocks the student's access to campus facilities.

47.     Loyola understands that it enters into contractual relationships with its students who pay tuition and fees to the University. In fact, Loyola routinely files civil actions alleging breach of contract against students who fail to pay the full amount of tuition and fees assessed to them for the classes in which they enroll. For example, in September 2017, Loyola sued a student in the Circuit Court of Cook County, Illinois Municipal Department, 1st District, No. 17M1 125565, alleging breach of contract for failure to pay tuition. In that case, Loyola indicated that it "performed all of the conditions and duties on their part" and sought the unpaid balance due and owing from the student in that case. *See* Exhibit D.

48.     For students who register and pay for *on-campus* courses, the conditions and duties required on Loyola's part include the provision of the in-person instruction and access to campus resources and facilities that are promised. The contractual relationship between Plaintiffs and Class members, on the one hand, and the University, on the other, is based on the terms and conditions set forth not only in Loyola's registration process, but also in Loyola's catalogues, bulletins, circulars, and regulations made available to students, including, *inter alia*, Defendant's 2019-2020 Course Catalog ("Course Catalog"), Community Standards, Information Technology Services Policies, Office of the Bursar Policies, Facility Policies, and Student Organization Handbook. As these and other Loyola materials set out, in exchange for enrolling in and paying for Defendant's in-person courses and programs, Plaintiffs and Class members were promised on-campus instruction and specific campus resources.

12

49.     First, as illustrated in the examples below, in describing courses, the Course Catalog made numerous statements promising students that the courses for which Plaintiffs and Class members registered would be delivered *on-campus*. *See* Exhibit E.[20] On information and belief, the online course registration portal LOCUS contained the same promises concerning the mode and nature of the instruction for which students were contracting with the university. For example, under "Components," many class descriptions specified that courses would involve "In person" or "Laboratory" elements. Additionally, for "Room Requirements," course descriptions represented that classes would be held in on-campus facilities, for example, in a "Seminar (1)" or "Lab – Chemistry (1)."

50.     Moreover, Defendant's Information Technology Services Policies promise that

```
ACMAT  161(4)                      Course ID:013943        01-JAN-2020
Calculus I
A traditional introduction to differential and integral calculus. Functions, limits, differentiation, the
Intermediate Value Theorem, curve sketching, optimization problem, related rates, definite and indefinite
integrals, the Fundamental Theorem of Calculus, logarithm and exponential functions, applications to the
natural and social sciences.

Restricted to Arrupe students. Students are eligible to enroll in the course upon successful completion of
ACMAT 118 or by math placement exam.

CHEM  225(1)                       Course ID:001611        01-JAN-2020
Organic Chemistry Lab A
A laboratory course for non-chemistry majors designed to reinforce lecture topics from 223 and to expose
students to the safe handling of organic chemicals.

Prerequisites: CHEM 102+112 (or Chem 106) and MATH 118 (or equivalent)\

Outcome:  Students will acquire basic laboratory techniques and practices for working with organic chemicals.
   Components:        Laboratory
   Attributes:        Forensic Science
   Requirement Group: Prerequisites: CHEM 102+112 (or CHEM 106) and MATH 118 (or equivalent)
   Req. Designation:  Service Learning
   Room Requirements: Lab - Chemistry(1)
```

"[a]ccess and use of public-access facilities, e.g., computing centers and computer labs, are available to students." *See* Exhibit F.[21] Additionally, per the Office of the Bursar Policies, in exchange for students' payment of the Student Development Fee, Defendant promises to "fund[] multiple programs and services for students," including "the Wellness Center, Halas membership,

---

[20] The Course Catalog is also available at
https://www.luc.edu/media/lucedu/registrationrecords/pdfs/Course_Descriptions_2019-2020.pdf (last visited September 2, 2020).
[21] Also available at https://www.luc.edu/policy/informationtechnologyservicespolicies/ (last visited August 29, 2020).

shuttle bus, and 8-ride programs," as well as "funding for clubs and organizations" and "a few special events organized by the students and administrators." *See* Exhibit G.[22] Other University catalogues, bulletins, circulars, and regulations promise to Plaintiffs and Class members, for example, a campus shuttle service and access to cultural and social events. *See* Exhibit H. [23] They also promise students a chance to participate in student organizations that, in turn, "are afforded the privilege of being able to request and use University space and facilities." *See* Exhibit I.[24]

51.     Finally, as set forth in Defendant's regulation for tuition and fees and in its definitions for Online Learning at Loyola, when Plaintiffs and Class members registered and paid the distinct and higher tuition and fees for on-campus programs—as opposed to online programs—Defendant promised them that their courses would *not* be delivered, in part or in full, online. *See* Exhibit J.

52.     All told, by registering and paying for Defendant's on-campus courses, Plaintiffs and Class members did not merely hope to receive in-person instruction and campus resources—they were contractually entitled to it.

    **D.     Defendant's Shift to Online Operations in Response to COVID-19**

53.     On January 13, 2020, Loyola's Spring 2020 semester began for undergraduate students who had enrolled in on-campus classes. [25] Final examinations for the Spring 2020 semester for these students were scheduled to conclude on May 2, 2020.  In other words, undergraduate students enrolled in on-campus courses at Loyola for the Spring 2020 semester contracted for 110 days of in-person instruction and access to facilities, services, and resources.

54.     Indeed, from January 13, 2020 through March 10, 2020, pursuant to the terms of their agreement with Defendant, Plaintiffs Pfeifer, Botello, and Whalen attended classes in-person

---

[22] Also available at https://www.luc.edu/bursar/faqs.shtml (last visited August 29, 2020).

[23] Also available at https://www.luc.edu/hr/sweg/benefitsservices/ (last visited August 29, 2020).

[24] Also available at
https://www.luc.edu/media/lucedu/saga/docs/RSO%20Handbook%202.13.20_publishable%20version.pdf (last visited August 29, 2020).

[25] Note that the Spring 2020 semester academic calendar dates for Loyola graduate students is no longer available online.

on Loyola's campuses and enjoyed full access to a myriad of campus facilities, events, services, and more.

55.     However, on March 9, 2020—the first day back from spring break—students' access to in-person class and campus resources came to a screeching halt. First, the University advised faculty that courses could begin moving online. "Every class that can be moved online (and this includes all lecture classes) must begin preparations for this transition," Defendant announced.[26]

56.     Two days later, on March 11, 2020, the University canceled two events scheduled for later that week: the Climate Conference on March 12-13 and the Palmer Research Symposium on March 13.[27]

57.     The next day, on March 12, 2020, the University announced that, effective March 13 and continuing through the end of the semester, "all **in-person, face-to-face classes** will be suspended."[28] All classes—including those that, per the University's March 9 message, could *not* be moved online—would commence virtually "as soon as possible but no later than Monday, March 23."[29] That is, during this transition, from March 13 to March 23, Loyola students were not guaranteed *any* instruction whatsoever.

58.     The University further announced on March 12, 2020 that all residential students were expected to leave campus for the remainder of the Spring 2020 semester "as soon as possible," and certainly by the end of day on March 19, 2020, when residence halls would close. Moreover, the University prohibited "[a]ll University-sponsored events with participation greater than 70 people" on Loyola campuses.[30] Despite these restrictions, Defendant affirmed that the

---

[26] https://www.luc.edu/coronavirus/previousmessages/2020-0309-preparingforonlineclasses.shtml (last visited August 28, 2020).

[27] https://www.luc.edu/coronavirus/previousmessages/2020-0311-vietnamcentereventsandcampusupdate.shtml (last visited August 29, 2020).

[28] https://www.luc.edu/coronavirus/previousmessages/2020-0312-1-coronaviruscovid-19update.shtml (last visited August 28, 2020).

[29] *Id.*

[30] *Id.*

15

University would "remain[] open to ensure academic and research continuity in support of our students' progress towards the completion of the term."[31]

59.     Yet, one week later, on March 19, Defendant announced that the entire campus would largely shut down the following day: "While the University remains open and will continue to offer online instruction and essential services, **we expect to begin closing nearly all University buildings by 5 p.m. tomorrow (Friday, March 20)**."[32] Beginning on March 20, "ONLY essential personnel—such as life, safety, plant, and animal care personnel, among select others" were permitted to access campus buildings. Additionally, in the March 19 announcement, the University also shared that the intercampus shuttle service would cease operations at 7 p.m. that evening.

60.     Thus, although Defendant maintained that the University was technically "open," for on-campus students, it was anything but. Beginning on March 9, 2020, just 56 days into what was supposed to be a 110-day-long on-campus Loyola Experience, complete with what Defendant itself characterized "in-person, face-to-face classes," Plaintiffs and Class members began losing access to the in-person instruction and amenities for which they had contracted. By March 20, 2020—eight days after the University vowed to remain open—Loyola's physical campuses and in-person resources were completely closed off to students.

61.     Moreover, the entire Summer Sessions I and II were held virtually, further denying many students access to campus or campus-based services and facilities for which had already paid.

> **E.     Defendant Denied Plaintiffs and the Class with What They Bargained For**

62.     As noted above, prior to COVID-19, Defendant offered students the opportunity to take online courses and receive certain degrees through Online Learning at Loyola. In Loyola's online programs, at least 30% and as much as 100% of the courses were delivered online;

---

[31] *Id.*

[32] https://www.luc.edu/coronavirus/previousmessages/2020-0319-1-campuschangesandclosurescovid19responseupdate.shtml (last visited August 28, 2020).

meanwhile, Loyola's on-campus programs were delivered fully in-person.

63. Also noted above, during the 2019-2020 academic year, Defendant charged online undergraduate students $693 per credit hour in tuition, while charging full-time, on-campus, undergraduate students between $1,050.71 and $1,838.75 per credit hour. Additionally, regarding fees, Defendant charged online undergraduate students *at most* a $92 Student Development Fee (compared to $419 for full-time, on-campus, undergraduate students) and a $78 Technology Fee (compared to $125 for full-time, on-campus, undergraduate students).

64. Defendant thus charged significantly more for in-person programs as it charged for online programs, recognizing that online courses are not the same as live classes and should cost less.

65. Even for the Fall 2020 semester, Defendant's pricing structure acknowledges that an online-only undergraduate option is worth significantly less than its on-campus counterpart.[33]

66. But rather than contract for and pay less for Defendant's online programs, Plaintiffs and the Class contracted for and paid more for Loyola's traditional, residential, in-person programs. They paid increased costs in tuition and fees for live, in-person instruction and access to the "Loyola Experience," including the University's facilities, technology, and resources.

67. The tuition and fees that Defendant charged Plaintiffs and Class members were predicated, for example, on students' in-person interaction with and feedback from peers, mentors, professors, and guest lecturers; access to technology, computer labs, libraries, and laboratories; ability to use recreational facilities, participate in sports, attend athletic and cultural events, use campus transportation services, participate in student government, access campus health services, join extracurricular groups, and much more.

68. However, beginning on March 9, 2020, Defendant began suspending in-person, face-to-face classes for Plaintiffs and Class members. By March 23, 2020, Defendant had closed its physical campuses and shifted these students exclusively into courses that were delivered 100%

---

[33] https://www.luc.edu/bursar/tuitionfees/2020-2021/ (last visited August 29, 2020).

17

online.

69.     Thus, just halfway into the Spring 2020 semester, Defendant ceased providing the education, services, facilities, technology, access, and opportunities that it had marketed and, indeed, promised to Plaintiffs and the Class. Instead, Plaintiffs and Class members were provided with an online substitute that deprived them of the benefits for which they had bargained and which Defendant's own pricing structure acknowledges is worth significantly less than the value of live classes.

70.     Indeed, Defendant has all but admitted that students did not receive the in-person education for which Plaintiffs and Class members had bargained. Below is a revealing question and response from an FAQ posted by the University:

> **Will my child be getting the same level of academic instruction through online classes?** Every effort has been made to ensure a smooth transition to online learning, and our faculty are being supported with training, resources, and tools to conduct their lessons online.[34]

71.     That is, for families wondering if their children would get the academic instruction for which they had bargained, the University could not answer with a simple "yes" and instead offered only vague hedging.

72.     Understandably, Plaintiffs and Class members are dissatisfied with the education and services that they received—or, rather, did not receive—since March 9, 2020. This dissatisfaction is independently evidenced by an online petition, "*Lower tuition for Loyola University Chicago Spring semester after classes went online,*" that was started by a Loyola student.[35] The petition—which quickly garnered 2,000 signatures[36]—asks for a decrease in tuition for the Spring 2020 semester because "[o]nline classes are not what students signed up for, and

---

[34] https://www.luc.edu/coronavirus/faqs/index.cfm (last visited August 29, 2020).

[35] https://www.change.org/p/loyola-university-chicago-lower-tuition-for-loyola-university-chicago-spring-semester-after-classes-went-online (last visited September 2, 2020).

[36] http://loyolaphoenix.com/2020/04/student-petition-calls-for-loyola-to-lower-tuition/ (last visited September 2, 2020).

therefore [students] should not be paying full tuition price."[37]

73.     Students who signed the petition were also given the opportunity to post a comment, explaining why they did so. These postings, a sample of which are quoted below, are revealing:

    a.  "It's not fair to pay full tuition when we are not able to access everything we would be able to on campus. Secondly we did not pay to take online courses and our room/board and meal plans are being altered so why shouldn't our tuition be the same?" (posted by Luis Angel Martinez);

    b.  "Tuition covers more than instruction, and students are not getting the on-campus resources they paid for." (posted by Heather Cramond);

    c.  "It's the right thing. A virtual offering is a reasonable substitute given the circumstances. However, this changes what is being offered and so tuition should adjust to reflect this." (posted by Noah Arjam);

    d.  "Everything about my last semester here was pretty much taken away from me: my favorite classes I've ever taken, the senior send-off activities, my last show with my a cappella group that I've been part of for all four years, and possibly graduation. It's just not fair that we have to pay full price for online classes and no activities." (posted by Baylee Corona);

    e.  "We deserve money back because we never signed up for online classes. This is not what we paid for. If knowing so before I would've just went to the Cambridge website and took online classes for free." (posted by Ryan Hong);

    f.  "I want the tuition lowered to reflect the lack of resources." (posted by Kiana Janson).

74.     The foregoing is just an illustrative sample of students' postings. There are many other comments with similar sentiments by Loyola students, expressing the view that neither the online instruction nor the lack of campus facilities equate with the bargained for service and instruction for which students signed up when they enrolled at Loyola.

75.     Yet, despite denying Plaintiffs and Class members in-person instruction and on-campus resources for essentially half of the Spring 2020 semester, and despite pleas from

---

[37] *Id.*

thousands of students, Defendant has maintained that it will not issue refunds for tuition or most mandatory fees for the Spring 2020 semester. Instead, the University offered only partial credits for the Student Development Fee.[38]

76.     While Plaintiffs recognize that, in closing its physical campuses and shifting all instruction to online, Defendant likely took measures it deemed necessary to protect public health, the fact remains that the education and services that Defendant provided to students for the second half of the Spring 2020 semester were not that which Plaintiffs and the Class registered, bargained, and paid.

77.     Through this action, Plaintiffs seek—for themselves and the other Class members—damages for Defendant's breach of its agreement to provide live, in-person instruction and access to campus facilities, services, and resources. Those damages take the form of, *inter alia*, a refund of a percentage of tuition and fees reflecting the fact that students could no longer attend classes in-person and were instead given an online learning experience that is objectively worth less and that failed to provide access to resources and services for which Plaintiffs and Class members paid.

## V.     CLASS ACTION ALLEGATIONS

78.     Pursuant to Fed. R. Civ. P. 23(a), (b)(2), (b)(3), and/or (c)(4), Plaintiffs bring this action on behalf of herself and the following Class:

> All persons who paid, on behalf of themselves or another, tuition or fees for on-campus programs at Loyola University of Chicago for the Spring 2020 semester.

79.     A class action is a superior means to ensure the fair and efficient adjudication of this case. The damages suffered by individual Class members are relatively small compared to the

---

[38] For a full-time undergraduate student who had paid $419 for this fee, Defendant issued a $183 credit. Notably, for the Fall 2020 semester—when most of Loyola classes are being delivered online—Defendant is not charging this fee at all. *See* https://www.luc.edu/coronavirus/faqs/index.cfm (last visited August 29, 2020). This is essentially an admission that, when its campuses are closed, Defendant cannot and does not provide the many benefits meant to be covered by this fee; thus, students deserve a much greater refund for the Spring 2020 semester than that which they have received to date.

burden and expense of individual litigation of the claims described herein against Defendant. Moreover, individualized actions would run the risk of creating inconsistent or contradictory judgments arising from the same set of facts and would increase the likely delay and expense to all parties involved and the Court itself. By contrast, by proceeding as a class action, the claims at issue can be adjudicated efficiently through economies of scale.

80. **Numerosity.** In accordance with Fed. R. Civ. P. 23(a)(1), the members the proposed Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. Although the precise number of Class members is unknown presently to Plaintiffs, the Class is presumed to number more than 17,000 people and is easily ascertainable through enrollment and financial records maintained by Defendant.

81. **Commonality and Predominance.** In accordance with Fed. R. Civ. P 23(a)(1) and (b)(3), this action involves questions of law and fact common to the Class that predominate over any individual questions specific to any Class member. These include:

    a. whether Defendant accepted money from the Class;

    b. whether Defendant charged more at the beginning of the semester for in-person instruction and use of facilities than on-line instruction;

    c. whether Defendant provided a full semester of in-person instruction and use of facilities to persons who paid for it;

    d. whether Defendant retained money from the Class for services it did not render, or only partially rendered;

    e. whether Defendant entered into a contract with the Class;

    f. whether Defendant breached its contract with the Class;

    g. whether Defendant benefitted from the money it accepted from the Class;

    h. whether certification of the Class is appropriate under Fed. R. Civ. P. 23;

    i. whether Class members are entitled to declaratory, equitable, or injunctive relief, and/or other relief; and

    j. the amount and nature of relief to be awarded to Plaintiffs and the other Class members.

82. **Typicality.** Pursuant to Fed. R. Civ. P. 23(a)(3), Plaintiffs' claims are typical of

the other Class members' claims because Plaintiffs and the other Class members each paid for tuition and fee costs associated with the Spring 2020 semester but were not provided the instruction and services that those costs were meant to cover. Each suffered damages in the form of their lost tuition, fees, and other monies paid to Defendant, and the claims all arise from the same Loyola University of Chicago practices and course of conduct. There are no defenses available that are unique to Plaintiffs.

83.     **Adequacy of Representation.**   In accordance with Fed. R. Civ. P 23(a)(4), Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other proposed Class members.   Moreover, Plaintiffs have retained counsel competent and experienced in complex class action litigation, and they intend to prosecute this action vigorously on behalf of their fellow Class members.   Plaintiffs have no interests that are antagonistic to those of the Class and they will fairly and adequately protect the proposed Class' rights along with counsel.

<u>**COUNT I**</u>

**Breach of Contract**

84.     Plaintiffs repeat and re-allege the allegations in Paragraphs 1-83 above, as if fully alleged herein.

85.     Plaintiffs bring this claim individually and on behalf of the other members of the Class.

86.     Defendant offers two distinct types of academic programs: (1) online programs, in which anywhere from 0% to 70% of courses are delivered on-campus, with the remainder being delivered online; and (2) what Defendant refers to as "in-person, face-to-face classes," which are delivered on Defendant's physical campuses.

87.     Plaintiffs and Class members registered specifically for the latter: Defendant's on-campus programs.

88.     Defendant billed Plaintiffs and the Class tuition and fees for on-campus programs

22

(as opposed to lower rates for online programs), which Plaintiffs paid and Class members paid.

89.     Defendant required students to enter into a binding agreement to pay tuition and fees in exchange for specific types of on-campus classes for which they enrolled.

90.     Plaintiffs and Class members thereby entered into binding contracts with Defendant for on-campus programs for the Spring 2020 semester.

91.     The terms of these contracts are set forth in Defendant's catalogues, bulletins, circulars, and regulations that were made available to students. Through these materials, Defendant made specific promises to, among other things, provide to Plaintiffs and Class members in-person instruction in campus facilities, along with access to campus building and resources for the full duration of the Spring 2020 semester.

92.     However, beginning in mid-March, roughly halfway into the contract term, Defendant ceased providing the agreed upon instruction, amenities, and access to Plaintiffs and Class members for which they paid. By first altogether suspending in-person classes and, eventually, closing all campus buildings and facilities to students, Defendant failed to perform its contractually agreed-upon services *at all* for nearly half of the Spring 2020 semester.

93.     Defendant has breached its contract with Plaintiffs and the Class by failing to provide the promised in-person instruction and access to campus facilities and resources, yet has retained tuition and fee payments paid by Plaintiffs and the other members of the Class for these promised benefits.

94.     Plaintiffs and the members of the Class have therefore been denied the benefit of their bargain.

95.     Plaintiffs and members of the Class have performed all of the obligations on them pursuant to their agreement with Defendant, including by making tuition and fee payments to Defendant for the Spring 2020 semester, or securing students loans and/or scholarships to make such payments.

96.     Plaintiffs and the members of the Class have suffered damages as a direct and

proximate result of Defendant's breach, including being deprived of the in-person instruction and access to campus facilities, events, and resources that they were promised.

97.    Defendant has failed to compensate Plaintiffs and the Class for the damages they have suffered as a result of Defendant's actions.

98.    Specifically, Defendant has failed to refund or reimburse Plaintiffs and the Class the prorated portion of tuition and fees necessary to compensate them for the difference in value between what they bargained and paid for and what they received.

99.    To the extent the COVID-19 pandemic frustrated the purpose of Plaintiffs' and the Class's bargain and expectation to attend in-person classes and have access to campus activities, facilities, resources, and services, Plaintiffs and the Class are excused from paying full tuition and fees and are entitled to receive the prorated portion of tuition and fees necessary to compensate them for the difference in value between what they paid for and what they received.

100.    Plaintiffs and the Class are entitled to damages representing the difference in value between what they contracted for and what they received.

101.    Plaintiffs and the Class seek all damages and equitable relief to which they may be entitled.

## <u>COUNT II</u>

### Unjust Enrichment

102.    Plaintiffs repeat and re-allege the allegations in Paragraphs 1-101, above, as if fully alleged herein.

103.    Plaintiffs bring this claim individually and on behalf of the other members of the Class in the alternative to the breach of contract claim brought in Count I.

104.    Plaintiffs and the Class conferred a benefit on Defendant in the form of tuition and fees for the Spring 2020 semester.

105.    Defendant was aware of and voluntary accepted this benefit.

106.    Plaintiffs and Class members paid Defendant tuition and fees in exchange for in-

24

person, on-campus instruction, along with access to campus facilities and resources, for the full duration of the Spring 2020 semester.

107.    Beginning in mid-March 2020, as described above, Defendant failed to provide such instruction and access.

108.    Despite failing to provide the benefits owed, Defendant has retained and appreciated the benefit of the amount of tuition and fees that Plaintiffs and the Class provided, to the detriment of Plaintiffs and the Class.

109.    For the reasons set forth in this Complaint, the circumstances are such that Defendant's retention of this benefit violates fundamental principles of justice, equity, and good conscience.

110.    Defendant has thus been unjustly enriched by Plaintiffs' and the Class's payment of tuition and fees for the Spring 2020 semester.

111.    There is no justification or cause for Defendant's failure to return the portion of the tuition and fees that Defendant has unjustly retained even though it failed to complete the services for which Plaintiffs and the Class conferred the benefit to Defendant.

112.    Accordingly, Plaintiffs and members of the Class are entitled to and seek disgorgement and restitution of the benefits unjustly retained, whether in whole or in part, including through refunds for tuition and fees.

## VI.    <u>PRAYER FOR RELIEF</u>

113.    Plaintiffs, individually and on behalf of the members of the Class, respectfully request that the Court enter judgment in their favor and against Defendant as follows:

a.    Certifying the Class as requested herein, designating Plaintiffs as Class representatives, and appointing the undersigned counsel as Class Counsel;

b.    Declaring that Defendant is financially responsible for notifying the Class members of the pendency of this suit;

c.    Declaring that Defendant wrongfully kept the monies paid by the Class;

25

    d.      Awarding injunctive relief and restitution as permitted by law or equity;

    e.      Awarding Plaintiffs' reasonable attorneys' fees, costs, and expenses;

    f.      Awarding pre- and post-judgment interest on any amounts awarded; and

    g.      Awarding such other and further relief as the Court deems just and proper.

## VII.   **DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure on all causes of action so triable.


Dated:  September 4, 2020             Respectfully submitted,

                            /s/ Elizabeth A. Fegan
                          Elizabeth A. Fegan
                          Fegan Scott LLC
                          150 S. Wacker Dr., 24th Floor
                          Chicago, IL 60606
                          Tel: (312) 741-1019
                          Email: beth@feganscott.com

                          Ellen T. Noteware
                          BERGER MONTAGUE PC
                          1818 Market Street, Suite 3600
                          Philadelphia, PA 19103
                          Tel: (215) 875-3000
                          Email: enoteware@bm.net

                          E. Michelle Drake
                          BERGER MONTAGUE PC
                          43 Southeast Main Street, Suite 505
                          Minneapolis, MN 55414
                          Tel: (612) 594-5999
                          Email: emdrake@bm.net

                          *Attorneys for Plaintiffs and the Class*

## CERTIFICATE OF SERVICE

I, Elizabeth A. Fegan, an attorney, affirm that the foregoing Amended Complaint was

filed on September 4, 2020 on ECF, which automatically served all counsel of record.

Dated:  September 4, 2020                                Respectfully submitted,

                                                        /s/ Elizabeth A. Fegan
                                                        Elizabeth A. Fegan

27