## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| SIMON PFEIFER, ISABEL BOTELLO, and KARI WHALEN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>    v.<br><br>LOYOLA UNIVERSITY OF CHICAGO,<br><br>Defendant. | Case No. 20-cv-03116<br><br>Honorable Robert W. Gettleman<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>   **(1) BREACH OF CONTRACT; and**<br>   **(2) UNJUST ENRICHMENT;**<br><br>JURY TRIAL DEMANDED |

Plaintiffs Simon Pfeifer, Isabel Botello, and Kari Whalen ("Plaintiffs"), individually and on behalf of all other similarly situated individuals, bring this class action complaint against the Loyola University of Chicago ("Loyola," the "University" or "Defendant"). Plaintiffs make the following allegations upon personal knowledge as to their own acts and upon information and belief and their attorneys' investigation as to all other matters.

## I.    <u>NATURE OF THE ACTION</u>

1.    This action is brought on behalf of students of Loyola University of Chicago who seek a fair adjustment of the top-dollar tuition and fees that Defendant retains despite the termination of in-person instruction, and the loss of related access, benefits, and services in the middle of the Spring 2020 semester due to the Coronavirus Disease 2019 ("COVID-19") pandemic.

2.    As set forth more fully below, during the Spring 2020 semester, Plaintiffs and other similarly situated individuals ("the Class") contracted with Defendant for certain services; namely, a full semester's worth of live, on-campus instruction, along with access to campus facilities,

communities, events, and other resources.

3.  Plaintiffs and Class members upheld their end of the bargain, collectively paying Defendant millions of dollars in tuition and mandatory fees.

4.  However, just over halfway into the Spring 2020 semester, Defendant abruptly denied Plaintiffs and Class members the on-campus instruction and access to campus resources for which they had contracted. On March 13, 2020, Defendant suspended "all in-person, face-to-face classes."[1] On March 19, 2020, barring exceptional circumstances, Defendant evicted Loyola students from on-campus housing.[2] At 5 p.m. on March 20, 2020, Defendant closed "nearly all University buildings" to Loyola students.[3]

5.  As a result, Plaintiffs and the Class did not receive the full semester's worth of in-person education and on-campus benefits for which they bargained.

6.  Plaintiffs and the Class therefore seek damages and/or restitution in the form of tuition and fee refunds of the tuition and fees they were responsible for paying for the Spring 2020 semester for the period during which they were denied in-person, on-campus instruction and access to campus facilities and resources.

## II.  PARTIES

### A.  Plaintiffs

7.  Plaintiff Simon Pfeifer ("Plaintiff Pfeifer") is a resident of Winter Springs, Florida. During the 2019-2020 academic year, Plaintiff Pfeifer was a second-year, full-time undergraduate student at Loyola, where he was majoring in History. During the Spring 2020 semester, Plaintiff Pfeifer registered specifically and exclusively for Loyola's in-person, on-campus courses. Prior to the campus closure, Plaintiff Pfeifer had access to, and regularly accessed, campus resources and

---

[1] https://www.luc.edu/coronavirus/previousmessages/2020-0312-1-coronaviruscovid-19update.shtml (last visited Jan. 5, 2023).

[2] *Id.*

[3] https://www.luc.edu/coronavirus/previousmessages/2020-0319-1-campuschangesandclosurescovid19responseupdate.shtml (last visited Jan. 5, 2023).

facilities, including gyms, libraries, and parking facilities. He also participated in a fraternity. In exchange for his on-campus studies during the Spring 2020 semester, Plaintiff Pfeifer was responsible for paying Defendant $22,065 in tuition, a $125 Technology Fee, a $419 Student Development Fee, a $155 CTA U-Pass Fee, and a $50 Language Lab fee. Finally, in the fall of 2019, Plaintiff Pfeifer paid Defendant $530 for an annual parking permit.

8.      Plaintiff Isabel Botello ("Plaintiff Botello") is a resident of Itasca, Illinois. During the 2019-2020 academic year, Plaintiff Botello was a second-year, full-time undergraduate student at Loyola, where she was majoring in Psychology. During the Spring 2020 Semester, Plaintiff Botello registered specifically and exclusively for Loyola's in-person, on-campus courses. Prior to the campus closure, Plaintiff Botello had access to, and regularly accessed, campus resources and facilities, including the Loyola campus library, as she did not have wireless internet at home. She also used the campus gym multiple times each week. In exchange for her on-campus studies during the Spring 2020 semester, Plaintiff Botello was responsible for paying Defendant $22,065 in tuition, a $125 Technology Fee, a $419 Student Development Fee, and a $155 CTA U-Pass Fee, which required her to take out loans. In the fall of 2019, she also paid Defendant $530 for an annual parking permit.

9.      Plaintiff Kari Whalen ("Plaintiff Whalen") is a resident of Morris, Illinois. During the 2019-2020 academic year, Plaintiff Whalen was a senior, full-time undergraduate student at Loyola, where she majored in Criminal Justice/Criminology and Psychology. During the Spring 2020 Semester, Plaintiff Whalen registered specifically and exclusively for Loyola's in-person, on-campus courses. Prior to the campus closure, Plaintiff Whalen had access to, and regularly accessed, campus resources and facilities, and in fact used the campus gym nearly every day. She also worked at the gym as a manager—a job which she lost when Defendant closed its campuses, thus causing Plaintiff Whalen to lose her only source of income. In exchange for her on-campus studies during the Spring 2020 semester, Plaintiff Whalen was responsible for paying Defendant $22,065 in tuition, a $125 Technology Fee, a $419 Student Development Fee, and a $155 CTA U-

Pass Fee.

### B. __Defendant__

10.     Loyola University of Chicago is a private, not-for-profit corporation with its principal place of business is in Chicago, Illinois.

## III.    __JURISDICTION AND VENUE__

11.     This Court has original jurisdiction under 28 U.S.C. § 1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005, because at least one Class member is of diverse citizenship from one Defendant, there are more than 100 Class members, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, and costs.

12.     This Court has personal jurisdiction over Defendant because Defendant maintains its principal place of business in this judicial District.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1), because Defendant resides in this District and is a resident of Illinois.

## IV.    __FACTUAL ALLEGATIONS__

### A.    **Background**

14.     Prior to the Spring 2020 semester, Loyola University marketed itself to prospective undergraduate and graduate students as a diverse campus-based community that offered in-person and experiential learning on its physical campuses and other partner institutions. Loyola offered prospective undergraduate students a residential college experience, that, in addition to providing in-person classes and experiential learning, offered opportunities beyond the classroom to connect, learn, and engage on campus. It is those shared experiences and co-curricular activities that the University claimed differentiate it from other institutions and justify its high cost. Loyola also marketed similar in-person, campus-based instruction and opportunities to graduate students.

15.      Like other residential colleges and universities, Loyola does not merely sell credit hours and diplomas in exchange for money, as one would sell some common consumer commodity. Rather, Defendant sells an educational experience based on specific services,

4

including live, in-person classes and access to campus facilities, events, opportunities, resources, and a rich tapestry of co-curricular experiences.

16.     Founded in 1870 and now based in Chicago, Illinois and the surrounding area, Loyola is a prestigious, private, Jesuit research university. During the Spring 2019-2020 academic year, Loyola catered to both undergraduate and graduate students, offering over 80 undergraduate majors in fields ranging from chemistry to dance, and over 140 graduate, professional, and graduate-level certificate programs, across 11 schools and colleges.

17.     In fall 2019, Loyola enrolled over 12,000 undergraduates and nearly 5,000 graduate students, for a total enrollment of more than 17,000.[4]

18.     In 2019, Loyola had an endowment of more than $800 million.[5]

19.     Loyola is considered a top-tier higher education institution, ranking 104th in the best "National Universities" category of the 2020 edition of U.S. News & World Report's Best Colleges."

**B.     Before Spring 2020, Loyola Offered—and Distinguished Between—On-Campus and Online Programs**

20.     For the 2019-2020 school year, Loyola offered the vast majority its undergraduate students classes that would be taught in-person, on Loyola's campuses, as well as access to Loyola campus facilities. It also offered the vast majority of Loyola graduate and professional students in-person classes in Loyola's main campus and professional schools, such as the Law and Medical Schools, in addition to access to Loyola campus facilities and resources.

21.     Prior to the Spring 2020 semester, Loyola offered a few online class options, as well, primarily for nontraditional students. In the 2019-2020 academic year, Loyola offered seven adult degree completion programs, 21 graduate programs, and 18 certificate programs online.[6]

---

[4] https://www.luc.edu/media/lucedu/oie/Official_Statistics_2019_20.pdf (last visited Jan. 5, 2023).

[5] https://www.luc.edu/media/lucedu/finance/pdfs/fy19_financial_statements.pdf (last visited Jan. 5, 2023).

[6] https://web.archive.org/web/20200730140650/https://www.luc.edu/online/aboutloyolaonline/ (last visited Jan. 5, 2023).

22. Loyola's on-campus and online options for the 2019-2020 school year were not interchangeable. Instead, depending on whether a student contracted for an in-person program or an online one, Defendant provided an entirely different experience and set of services.

23. The distinctions were apparent at every step. For example, Defendant marketed its online programs—collectively referred to as "Online Learning at Loyola"—through both a unique website[7] and course catalog.[8]

24. Perhaps the greatest differences were in the format in which Defendant delivered instruction and resources depending on whether a student enrolled in an on-campus or online program—and the price Loyola charged for those services.

25. Prior to the Spring 2020 semester, for students who enrolled in one of Defendant's many traditional, in-person, on-campus programs, Defendant delivered 100% of the courses in-person at one of its physical campuses, as described in greater detail below. Notably, prior to Spring 2020, Defendant routinely acknowledged that certain classes—"includ[ing] labs, experiential learning classes, and research"—"requir[e] face-to-face interaction" and thus can *only* be taught in-person.[9] It is no doubt for this reason that, prior to COVID-19, the majority of Defendant's undergraduate and graduate programs were offered exclusively on-campus, with no online option.

26. Meanwhile, for students who enrolled in Online Learning at Loyola, Defendant provided instruction using a mix of online, hybrid, and blended courses. Online courses are those that require "no face-to-face meetings on campus," hybrid courses are those where "at least 75% of the course is delivered online," and blended courses are those where between 30 and 75% of the course is delivered online.[10] Given the format of these classes, Defendant has historically

---

[7] https://www.luc.edu/online/index.shtml (last visited Jan. 5, 2023).

[8] https://lucapps.luc.edu/online/course.htm (last visited Jan. 5, 2023).

[9] https://web.archive.org/web/20200828184501/https://www.luc.edu/coronavirus/faqs/index.cfm (last visited Jan. 5, 2023).

[10] https://www.luc.edu/online/online_definitions.html (last visited Jan. 5, 2023).

offered only a fraction of its overall academic offerings online.

27.     For the 2019-2020 academic year, Loyola charged markedly different tuition and fee for online programs as opposed to on-campus ones.[11]

28.     Specifically, Defendant charged on-campus, full-time[12] undergraduate students $22,065 in tuition per semester, or between $1,050.71 and $1,838.75 per credit hour.[13] Additionally, Defendant charged these students an array of mandatory fees[14], including but not limited to: a Student Development Fee ($419 per semester for full-time students), which largely funds student programs and services, clubs, and special events[15]; and a Technology Fee ($125 per semester for full-time students), which funds, computer labs, software, student technology support, and more.[16] In addition, Loyola students were responsible for paying a variety of mandatory course and supplies fees, and other miscellaneous fees.

29.     During the 2019-20 academic year, Loyola charged students enrolled in online bachelor's and certificate programs far lower amount of tuition and fees—merely $693 in tuition per credit.[17] Defendant also charged these online students, at most, a $92 Student Development Fee and a $78 Technology Fee—both markedly lower than the corresponding fees charged for on-campus students.

30.     These differences in tuition and mandatory fee charges reflect the fact that, for the Spring 2020 semester, Loyola students who enrolled in on-campus programs were to have access to facilities, events, activities, and other resources—coupled with face-to-face, live instruction—

---

[11] https://www.luc.edu/bursar/tuitionfees/2019-2020/ (last visited Jan. 5, 2023).

[12] Those taking 12-21 credit hours per semester; *see* https://www.luc.edu/bursar/tuitionfees/2019-2020/undergraduate/ (last visited Jan. 5, 2023).

[13] Part-time, on-campus undergraduate students were charged $814 in tuition per credit hour and fees based on how many credits in which they were enrolled. https://www.luc.edu/bursar/tuitionfees/2019-2020/undergraduate/ (last visited Jan. 5, 2023).

[14] *Id.*

[15] https://www.luc.edu/bursar/faqs.shtml (last visited Jan. 5, 2023).

[16] https://www.luc.edu/its/aboutits/itspoliciesguidelines/tech_fee_faq.shtml (last visited Jan. 5, 2023).

[17] https://www.luc.edu/bursar/tuitionfees/2019-2020/scps/ (last visited Jan. 5, 2023).

that were simply unavailable to those who instead opted to pursue their degrees online.

**C.** **Plaintiffs Contracted with Loyola for In-Person, Face-to-Face Classes and Access to Campus Facilities, Resources**

31. For the Spring 2020 semester, Plaintiffs each enrolled in in-person, on-campus classes, i.e., they registered (and were responsible to pay) to have access to in-person instruction and physical access to campus facilities and resources. In doing so, and unlike students enrolled in Online Learning at Loyola, they contracted with Defendant specifically for (1) courses that would be delivered 100% in-person and on-campus and (2) access to the many campus facilities and in-person resources and services that Loyola promised would be available to them.

32. The contractual relationship between Plaintiffs (and the proposed Class members), on the one hand, and Loyola, on the other, is based on the terms and conditions set forth in Loyola's catalogs, bulletins, circulars, and regulations made available to students, including, *inter alia*, Defendant's 2019-2020 Course Catalog ("Course Catalog"), Community Standards, Information Technology Services Policies, Office of the Bursar Policies, Facility Policies, and Student Organization Handbook, in addition to the statements made in the class registration process Plaintiffs and others followed prior to the Spring 2020 semester, and the parties' prior course of conduct. As these and other Loyola materials set out, in exchange for enrolling in and paying for Defendant's in-person courses and programs for the Spring 2020 semester, Plaintiffs and Class members were promised on-campus instruction and access to specific campus resources for the full duration of that semester.

33. First, in describing courses, Loyola's Course Catalog made numerous statements promising students courses that would be delivered *on-campus*. *See* Exhibit A.[18] Additionally, the Course Catalog promises in-person instruction, with numerous course listings specifying, for

---

[18] The Course Catalog is also available at https://www.luc.edu/media/lucedu/registrationrecords/pdfs/Course_Descriptions_2019-2020.pdf (last visited Jan. 5, 2023). On information and belief, Loyola's online course registration portal, LOCUS, contained the same promises concerning the mode and nature of the instruction for which students were contracting with the university.

example, that courses would involve "In person" or "Laboratory" elements and be held in on-campus facilities.

34.     The course descriptions in the Course Catalog impliedly or explicitly stated that courses would involve in-person, hands-on instruction. For example, the Course Catalog described a course titled "Ballet I: Introduction to Ballet Theory and Technique" as having: a "Component[]" of "Performance(In person)"; a "Room Requirement[]" of "Dance Studio(1)"; and an "Outcome" that "Students will improve their posture, flexibility and coordination. They will develop a reference for enjoying ballet performances and create a foundation for further dance training." Ex. A at 388.

35.     As another example, the Course Catalog described a course titled "General Biology I Lab" as having: a "Component[]" of "Laboratory"; a "Room Requirement[]" of "Lab – Biology(1)"; and an explanation that the course will involve " observation, experimentation, and when appropriate, dissection of representative organisms." *Id.* at 200. There are hundreds of other examples of these types of promises of in-person instruction in physical, not virtual, classrooms, laboratories, and performance spaces.

36.     In addition to the Course Catalog's promises of in-person instruction, Defendant promised that students who enrolled in on-campus courses would have access to campus facilities and resources. For example, Defendant's Information Technology Services Policies promised that "[a]ccess and use of public-access facilities, e.g., computing centers and computer labs, are available to students." *See* Exhibit B at 3.[19] Additionally, Loyola's Office of the Bursar Policies, promised that in exchange for students' payment of the Student Development Fee, Defendant promised to "fund[] multiple programs and services for students," including "the Wellness Center, Halas membership, shuttle bus, and 8-ride programs," as well as "funding for clubs and organizations" and "a few special events organized by the students and administrators." *See*

---

[19] Also available at https://www.luc.edu/policy/informationtechnologyservicespolicies/ (last visited Jan. 5, 2023).

Exhibit C at 1.[20]

37.    Other University catalogues, bulletins, circulars, and regulations promised to Plaintiffs and Class members, for example, a campus shuttle service and access to cultural and social events. *See* Exhibit D at 14, 15. [21] They also promised students a chance to participate in student organizations that, in turn, "are afforded the privilege of being able to request and use University space and facilities." *See* Exhibit E at 20.

38.    Additionally, as set forth in Defendant's regulation for tuition and fees and in its definitions for Online Learning at Loyola for the Spring 2020 semester, *see* Exhibit F at 1, when Plaintiffs and Class members registered and assumed the responsibility to pay the distinct and higher tuition and fees for on-campus programs—as opposed to online programs—Defendant promised them that their courses would *not* be delivered, in part or in full, online.

39.    All told, by registering and paying tuition and fees for Defendant's on-campus courses for the Spring 2020 semester, Plaintiffs and Class members did not merely hope to receive in-person instruction and campus resources for the full semester—they were contractually entitled to it. Indeed, the parties' prior course of conduct supports this: Prior to the Spring 2020 semester, when Plaintiffs and other students registered and paid and/or made arrangements to pay tuition and fees for in-person, on-campus courses, Defendant provided them with in-person instruction and campus access for the full duration of the corresponding semester.

40.    In addition to its course of conduct, catalogs, bulletins, circulars, and regulations, Loyola also represented across a variety of materials that students who enrolled in in-person, on-campus courses for the Spring 2020 semester would receive in-person instruction and access to a robust "campus life." Indeed, the navigation on Defendant's website for on-campus programs prominently featured (and still does feature) an entire section titled "Campus Life"—a section that did not exist on the navigation for Defendant's website for its online programs.[22]

---

[20] Also available at https://www.luc.edu/bursar/faqs.shtml (last visited Jan. 5, 2023).

[21] Also available at https://www.luc.edu/hr/sweg/benefitsservices/ (last visited Jan. 5, 2023).

[22] https://www.luc.edu/ (last visited Jan. 5, 2023).

41. Moreover, prior to the Spring 2020 semester, Defendant advertised that, across its two campuses—the Lake Shore Campus, the University's main residential campus, and the Water Town Campus, which is home to most of Defendant's graduate programs—in-person students could participate in hundreds of clubs, ranging from honors to political organizations and hobby to spiritual groups. "With **over 250 clubs and student-run organizations on campus**, there's always someone to connect with, something to do, and somewhere to be. It's easy to meet new friends and make new connections inside—and outside—the classroom," Defendant's website for on-campus programs stated.[23] Defendant also boasted an active in-person Greek life, more than 30 intramural and club sports, and more than 15 Division I sports.

42. Indeed, Defendant indicated that the University's mission involves offering its on-campus students "essential" co-curricular involvement and experiences "beyond the classroom":

**Philosophy Statement**

We believe co-curricular involvement is an essential part of Loyola University Chicago. It provides students with a variety of opportunities to explore their interests across a multitude of disciplines and fields. Through a model of challenge and support, we are committed to helping students develop into strong leaders and positive agents of social change.

…

**Student Activities & Greek Affairs Mission**
The mission of Student Activities & Greek Affairs is to offer opportunities for students to connect, learn, and engage ⁻ beyond the classroom. Through shared experiences students gain a greater sense of self and community to foster positive social change.

Ex. E at 5.

43. Additionally, Loyola represented that its on-campus Loyola students would have access to a wide range of campus facilities, including the Halas Recreation Center, Madonna della Strada Chapel, Arnold J. Damen Student Center, and the Loyola University Museum of Art.

---

[23] https://www.luc.edu/undergrad/featurecontent/canvases/residencelife/ (last visited Jan. 5, 2023).

44.     Throughout the website for Loyola's on-campus programs, Defendant routinely highlighted the many unique benefits of enrolling in an in-person, rather than online, program.

> Here, you will explore what interests you, pursue your passions, and leave transformed. **It's about more than what classes you'll take. It's the research opportunities, the internships, the exploration in the city (or not in the city), and the time you spend with friends**. Your time here will prepare you to launch your career with confidence.[24]

45.     Altogether, on-campus facilities, services, opportunities, and resources were so critical that the University *required* full-time first-year and second-year students to live in campus housing. "**As a residential campus committed to the education of the whole person, the residential experience is considered an integral part of a student's education and the Loyola Experience**," Defendant proclaimed in its description of the "Residency Requirement." *See* Exhibit G at 1.[25] Per this requirement, as set out in Defendant's 2019-2020 Community Standards, "All full-time first-year and second-year students are required to live in Loyola University Chicago Residence Life housing and purchase a meal plan. Typically, this requirement requires four semesters of residency in Loyola's residence halls (not including summer terms)." *See* Exhibit H at 66.

46.     As the Residency Requirement itself demonstrates, Defendant did not just *market* its on-campus programs and the in-person education and countless resources that go along with them. Instead, for students who enrolled in Defendant's full-time, on-campus programs for the Spring 2020 semester—including Plaintiffs and Class members—promises of on-campus instruction and access to facilities and resources were part of the contractual agreement between them and Defendant.

47.     Indeed, prior to the Spring 2020 semester, Defendant recognized that it enters into contractual agreements with students. At that time, prior to the start of each semester, Loyola students enrolled in classes through LOCUS. On LOCUS, Loyola students selected the classes for

---

[24] https://www.luc.edu/undergrad/letsgetstarted/freshman/ (last visited Jan. 5, 2023).

[25] Also available at https://www.luc.edu/reslife/about/residencyrequirement/(last visited Jan. 5, 2023).

12

which they would register each term. When students were choosing their classes, students could search for classes by subject matter, meeting time, meeting day, instructor, campus, location, and mode of instruction. *See generally* Exhibit I.

48.     Before a student registered for a class through LOCUS, they could click on links detailing information about the class format, syllabus, textbooks, and materials used in the class. LOCUS included a description of each class and notes about how the course would be taught, including whether there were service-learning or other in-person requirements.

49.     After choosing classes in LOCUS, Loyola required students to click a button indicating that they accept financial responsibility for paying for the specific classes for which they enrolled. *Id.* at 16.

50.     The Financial Responsibility Disclaimer that Loyola required its students to sign indicated that there is an agreement between the student and Loyola. It stated that in order for a student to enroll in classes at the University, the student must click the "I Accept" button. Recognizing that by doing so Loyola has entered a contractual binding agreement with the student, the Financial Responsibility Disclaimer required a student to "only be required to do so once per term, unless **the terms of the agreement** are altered by the university between the time that you start enrolling for that term and your completion of that process." *Id.*

51.     On information and belief, the Financial Responsibility Disclaimer Plaintiffs and other Loyola students signed before the start of the 2020 Spring semester indicated that the student was responsible for paying all tuition and other fees associated with *the classes in which they enrolled*. Each student agreed that Loyola could impose a 1.5% monthly late fee and place the student's account with a collection agency if the student's account was past due. The student was responsible for paying all fees and costs incurred by Loyola for collection of past due amounts. If an account was past due, Loyola blocked the student's access to campus facilities.

52.     Loyola understands that it enters into contractual relationships with its students who register for courses and pay tuition and fees to the University. In fact, Loyola routinely files civil

13

actions alleging breach of contract against students who fail to pay the full amount of tuition and fees assessed to them for the classes in which they enroll. For example, in September 2017, Loyola sued a student in the Circuit Court of Cook County, Illinois Municipal Department, 1st District, No. 17M1 125565, alleging breach of contract for failure to pay tuition. In that case, Loyola indicated that it "performed all of the conditions and duties on their part" and sought the unpaid balance due and owing from the student in that case. *See* Exhibit J.

### D.    Defendant's Shift to Online Operations in Response to COVID-19

53.    On January 13, 2020, Loyola's Spring 2020 semester began for undergraduate students who had enrolled in on-campus classes.[26] Final examinations for the Spring 2020 semester for these students were scheduled to conclude on May 2, 2020. In other words, undergraduate students enrolled in on-campus courses at Loyola for the Spring 2020 semester contracted for 110 days of in-person instruction and access to facilities, services, and resources.

54.    Indeed, from January 13, 2020 through March 10, 2020, pursuant to the terms of their agreement with Defendant, Plaintiffs attended classes in-person on Loyola's campuses and enjoyed full access to a myriad of campus facilities, events, services, and more.

55.    However, on March 9, 2020—the first day back from spring break—students' access to in-person class and campus resources came to a screeching halt. First, the University advised faculty that courses could begin moving online. "Every class that can be moved online (and this includes all lecture classes) must begin preparations for this transition," Defendant announced.[27]

56.    Two days later, on March 11, 2020, the University canceled two events scheduled for later that week: the Climate Conference on March 12-13 and the Palmer Research Symposium

---

[26] Plaintiffs have been unable to locate the Spring 2020 semester academic calendar dates for Loyola graduate programs.
[27] https://www.luc.edu/coronavirus/previousmessages/2020-0309-preparingforonlineclasses.shtml (last visited Jan. 5, 2023).

on March 13.[28]

57.    The next day, on March 12, 2020, the University announced that, effective March 13 and continuing through the end of the semester, "all **in-person, face-to-face classes** will be suspended."[29] All classes—including those that, per the University's March 9 message, could *not* be moved online—would commence virtually "as soon as possible but no later than Monday, March 23."[30] That is, during this transition, from March 13 to March 23, Loyola students were not guaranteed *any* instruction whatsoever.

58.    The University further announced on March 12, 2020 that all residential students were expected to leave campus for the remainder of the Spring 2020 semester "as soon as possible," and certainly by the end of day on March 19, 2020, when residence halls would close. Moreover, the University prohibited "[a]ll University-sponsored events with participation greater than 70 people" on Loyola campuses.[31] Despite these restrictions, Defendant affirmed that the University would "remain[] open to ensure academic and research continuity in support of our students' progress towards the completion of the term."[32]

59.    Yet, one week later, on March 19, Defendant announced that the entire campus would largely shut down the following day: "While the University remains open and will continue to offer online instruction and essential services, **we expect to begin closing nearly all University buildings by 5 p.m. tomorrow (Friday, March 20)**."[33] Beginning on March 20, "ONLY essential personnel—such as life, safety, plant, and animal care personnel, among select others" were

---

[28] https://www.luc.edu/coronavirus/previousmessages/2020-0311-vietnamcentereventsandcampusupdate.shtml (last visited Jan. 5, 2023).

[29] https://www.luc.edu/coronavirus/previousmessages/2020-0312-1-coronaviruscovid-19update.shtml (last visited Jan. 5, 2023).

[30] *Id.*

[31] *Id.*

[32] *Id.*

[33] https://www.luc.edu/coronavirus/previousmessages/2020-0319-1-campuschangesandclosurescovid19responseupdate.shtml (last visited Jan. 5, 2023).

permitted to access campus buildings.[34] Additionally, in the March 19 announcement, the University also shared that the intercampus shuttle service would cease operations at 7 p.m. that evening.[35]

60.     Thus, although Defendant maintained that the University was technically "open," for on-campus students, it was anything but. Beginning on March 9, 2020, just 56 days into what was supposed to be a 110-day-long semester, complete with campus access and what Defendant itself characterized as "in-person, face-to-face classes," Plaintiffs and Class members began losing access to the in-person instruction and campus amenities for which they had contracted. By March 20, 2020—eight days after the University vowed to remain open—Loyola's physical campuses and in-person resources were completely closed off to students.

### E.    Defendant Denied Plaintiffs and the Class the Benefit of Their Bargain

61.     As noted above, prior to COVID-19, Defendant offered students the opportunity to take online courses and receive certain degrees through Online Learning at Loyola. In Loyola's online programs, at least 30% and as much as 100% of the courses were delivered online; meanwhile, Loyola's on-campus programs were delivered fully in-person.

62.     Also noted above, during the 2019-2020 academic year, Defendant charged online undergraduate students $693 per credit hour in tuition, while charging full-time, on-campus, undergraduate students between $1,050.71 and $1,838.75 per credit hour. Additionally, regarding fees, Defendant charged online undergraduate students *at most* a $92 Student Development Fee (compared to $419 for full-time, on-campus, undergraduate students) and a $78 Technology Fee (compared to $125 for full-time, on-campus, undergraduate students).

63.     For the Spring 2020 semester, Defendant thus charged significantly more for in-person programs as it charged for online programs, recognizing that online courses are not the same as live classes and should cost less.

---

[34] *Id.*

[35] *Id.*

16

64.     But rather than contract for and pay less for Defendant's online programs, Plaintiffs and the Class contracted for and were responsible for paying more for Loyola's traditional, on-campus, in-person programs. They paid and/or made arrangements to pay increased costs in tuition and fees for live, in-person instruction and access to the University's facilities, technology, and resources.

65.     The tuition and fees that Defendant charged Plaintiffs and Class members were predicated, for example, on students' access to in-person instruction, which included hands-on and experiential learning opportunities and interaction with and feedback from peers, mentors, professors, and guest lecturers; access to technology, computer labs, libraries, and laboratories; ability to use recreational facilities, participate in sports, attend athletic and cultural events, use campus transportation services, participate in student government, access campus health services, join extracurricular groups, and much more.

66.     However, beginning on March 9, 2020, Defendant began suspending in-person, face-to-face classes for Plaintiffs and Class members. By March 23, 2020, Defendant had closed its physical campuses and shifted these students exclusively into courses that were delivered 100% online.

67.     Thus, just halfway into the Spring 2020 semester, Defendant ceased providing the education, services, facilities, technology, access, and opportunities that it had marketed and, indeed, promised to Plaintiffs and the Class. Instead, Plaintiffs and Class members were provided with an online substitute that deprived them of the benefits for which they had bargained and which Defendant's own pricing structure acknowledges is worth significantly less than in-person instruction and full access to campus facilities and resources.

68.     Indeed, Defendant has all but admitted that students did not receive the in-person education for which Plaintiffs and Class members had bargained. Below is a revealing question and response from an FAQ posted by the University:

> **Will my child be getting the same level of academic instruction through online classes?** Every effort has been made to ensure a smooth transition to online

17

learning, and our faculty are being supported with training, resources, and tools to conduct their lessons online.[36]

69.     That is, for families wondering if their children would get the academic instruction for which they had bargained, the University could not answer with a simple "yes."

70.     Understandably, Plaintiffs and Class members are dissatisfied that, for nearly half of the Spring 2020 semester, they did not receive the specific services for which they had contracted—i.e., in-person instruction and access to campus facilities and resources—and, moreover, did not receive any commensurate refund from Loyola for the hefty tuition and fees that they had already paid and/or made arrangements to pay.

71.     Students' dissatisfaction is independently evidenced by an online petition, "*Lower tuition for Loyola University Chicago Spring semester after classes went online*," that was started by a Loyola student.[37] The petition—which today has over 2,500 signatures—asks for a decrease in tuition for the Spring 2020 semester because "[o]nline classes are not what students signed up for, and therefore [students] should not be paying full tuition price."[38]

72.     Students who signed the petition were also given the opportunity to post a comment, explaining why they did so. These postings, a sample of which are quoted below, are revealing:

   a.   "It's not fair to pay full tuition when we are not able to access everything we would be able to on campus. Secondly we did not pay to take online courses and our room/board and meal plans are being altered so why shouldn't our tuition be the same?" (posted by Luis Angel Martinez);

   b.   "Tuition covers more than instruction, and students are not getting the on-campus resources they paid for." (posted by Heather Cramond);

   c.   "It's the right thing. A virtual offering is a reasonable substitute given the circumstances. However, this changes what is being offered and so tuition should

---

[36] https://web.archive.org/web/20200828184501/https://www.luc.edu/coronavirus/faqs/index.cfm (last visited Jan. 5, 2023).

[37] https://www.change.org/p/loyola-university-chicago-lower-tuition-for-loyola-university-chicago-spring-semester-after-classes-went-online (last visited Jan. 5, 2023).

[38] *Id.*

adjust to reflect this." (posted by Noah Arjam);

d. "Everything about my last semester here was pretty much taken away from me: my favorite classes I've ever taken, the senior send-off activities, my last show with my a cappella group that I've been part of for all four years, and possibly graduation. It's just not fair that we have to pay full price for online classes and no activities." (posted by Baylee Corona);

e. "We deserve money back because we never signed up for online classes. This is not what we paid for. If knowing so before I would've just went to the Cambridge website and took online classes for free." (posted by Ryan Hong);

f. "I want the tuition lowered to reflect the lack of resources." (posted by Kiana Janson).

73. The foregoing is just an illustrative sample of students' postings. There are many other comments with similar sentiments by Loyola students, expressing the view that neither the online instruction nor the lack of campus facilities satisfy what students bargained for when they registered and paid and/or made arrangements to pay tuition and mandatory fees for the Spring 2020 semester.

74. Yet, despite denying Plaintiffs and Class members in-person instruction and on-campus resources for essentially half of the Spring 2020 semester, and despite pleas from thousands of students, Defendant has maintained that it will not issue refunds for tuition or most mandatory fees for the Spring 2020 semester. Instead, the University offered only partial credits for the Student Development Fee.[39]

75. While Plaintiffs recognize that, in closing its physical campuses and shifting all instruction to online, Defendant likely took measures it deemed necessary to protect public health,

---

[39] For a full-time undergraduate student who had was responsible for paying $419 for this fee, Defendant issued a $183 credit. Notably, for the 2020-2021 academic year—when most of Loyola classes continued to be delivered online—Defendant did not charge this fee at all. *See* https://www.luc.edu/healthsafetyandwellbeing/generalinfo/communitymessages/2020-0626-1fall2020tuitionfeesandhousing.shtml (last visited Jan. 5, 2023). This is essentially an admission that, when instruction is remote and campus access is severely limited, Defendant cannot and does not provide the many benefits meant to be covered by this fee; thus, students deserve a much greater refund for the Spring 2020 semester than that which they have received to date.

the fact remains that the instruction and services that Defendant provided to students for the second half of the Spring 2020 semester were not that for which Plaintiffs and the Class had registered, bargained, and been responsible for paying.

76.     Through this action, Plaintiffs seek—for themselves and the other Class members—damages for Defendant's breach of its agreement to provide live, in-person instruction and access to campus facilities, services, and resources for the full duration of the Spring 2020 semester. Those damages take the form of, *inter alia*, a refund of a percentage of tuition and fees reflecting the fact that Plaintiffs and Class members were denied the in-person instruction and access to campus facilities, resources, and services for which they were responsible for paying.

## V.     CLASS ACTION ALLEGATIONS

77.     Pursuant to Fed. R. Civ. P. 23(a), (b)(2), (b)(3), and/or (c)(4), Plaintiffs bring this action on behalf of herself and the following Class:

> All students who enrolled in and were responsible for paying tuition and fees for in-person classes at Loyola University of Chicago for the Spring 2020 semester.

78.     A class action is a superior means to ensure the fair and efficient adjudication of this case. The damages suffered by individual Class members are relatively small compared to the burden and expense of individual litigation of the claims described herein against Defendant. Moreover, individualized actions would run the risk of creating inconsistent or contradictory judgments arising from the same set of facts and would increase the likely delay and expense to all parties involved and the Court itself. By contrast, by proceeding as a class action, the claims at issue can be adjudicated efficiently through economies of scale.

79.     **Numerosity.** In accordance with Fed. R. Civ. P. 23(a)(1), the members the proposed Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. Although the precise number of Class members is unknown presently to Plaintiffs, the Class is presumed to number more than 17,000 people and is easily ascertainable through enrollment and financial records maintained by Defendant.

80. **Commonality and Predominance.** In accordance with Fed. R. Civ. P 23(a)(1) and (b)(3), this action involves questions of law and fact common to the Class that predominate over any individual questions specific to any Class member. These include:

    a.  whether Defendant entered into a contract with the Class for the Spring 2020 semester;

    b.  the terms of any such contract;

    c.  whether Defendant breached its contract with the Class;

    d.  whether the Class is entitled to damages for any such breach;

    e.  whether Defendant benefitted unjustly from the money it accepted from the Class for the Spring 2020 semester;

    f.  whether certification of the Class is appropriate under Fed. R. Civ. P. 23;

    g.  whether Class members are entitled to declaratory, equitable, or injunctive relief, and/or other relief; and

    h.  the amount and nature of relief to be awarded to Plaintiffs and the other Class members.

81. **Typicality.** Pursuant to Fed. R. Civ. P. 23(a)(3), Plaintiffs' claims are typical of the other Class members' claims because Plaintiffs and the other Class members were each responsible for paying tuition and fee costs associated with the Spring 2020 semester but were not provided the instruction and services that those costs were meant to cover. Each suffered damages in the form of their lost tuition, fees, and other monies paid to Defendant, and the claims all arise from the same Loyola University of Chicago practices and course of conduct. There are no defenses available that are unique to Plaintiffs.

82. **Adequacy of Representation.** In accordance with Fed. R. Civ. P 23(a)(4), Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other proposed Class members. Moreover, Plaintiffs have retained counsel competent and experienced in complex class action litigation, and they intend to prosecute this action vigorously on behalf of their fellow Class members. Plaintiffs have no interests that are antagonistic to those of the Class and they will fairly and adequately protect the proposed Class' rights along with counsel.

## COUNT I

### Breach of Contract

83.     Plaintiffs repeat and re-allege the allegations in Paragraphs 1-82 above, as if fully alleged herein.

84.     Plaintiffs bring this claim individually and on behalf of the other members of the Class.

85.     For the Spring 2020 semester, Defendant offered two distinct types of academic programs: (1) online programs, in which anywhere from 0% to 70% of courses were to be delivered on-campus, with the remainder being delivered online; and (2) what Defendant referred to as "in-person, face-to-face classes," which were to be delivered on Defendant's physical campuses.

86.     For the Spring 2020 semester, Plaintiffs and Class members registered specifically for the latter: Defendant's on-campus courses and programs.

87.     Plaintiffs and Class members were therefore responsible for paying tuition and fees for the on-campus, in-person courses for which they registered. Defendant thereafter billed Plaintiffs and the Class tuition and fees for on-campus programs (as opposed to lower rates for online programs), which Plaintiffs paid and Class members paid and/or made arrangements to pay.

88.     Defendant required students to enter into a binding agreement to pay tuition and fees in exchange for specific types of on-campus classes for which they enrolled, along with access to appurtenant campus facilities and resources.

89.     Plaintiffs and Class members thereby entered into binding contracts with Defendant for on-campus programs for the Spring 2020 semester.

90.     The terms of these contracts are set forth in Defendant's catalogues, bulletins, circulars, and regulations that were made available to students, as well as Defendant's prior course of conduct, i.e., its practice of previously providing in-person instruction and access to campus resources to students who registered and paid and/or made arrangements to pay for such. Through Defendant's materials and prior conduct, Defendant made specific promises to, among other

22

things, provide to Plaintiffs and Class members in-person, on-campus instruction and access to campus facilities and resources for the full duration of the Spring 2020 semester.

91.     However, beginning in mid-March 2020, roughly halfway into the contract term, Defendant ceased providing the agreed upon instruction and access to various campus amenities to Plaintiffs and Class members for which they were responsible for paying. By first altogether suspending in-person classes and, eventually, closing all campus buildings and facilities to students, Defendant failed to perform its contractually agreed-upon services *at all* for nearly half of the Spring 2020 semester.

92.     Defendant has breached its contract with Plaintiffs and the Class by failing to provide the promised in-person instruction and access to campus facilities and resources, yet has retained tuition and fee payments paid by Plaintiffs and the other members of the Class for these promised benefits.

93.     Plaintiffs and the members of the Class have therefore been denied the benefit of their bargain.

94.     Plaintiffs and members of the Class have performed all of the obligations on them pursuant to their agreement with Defendant, including by making tuition and fee payments to Defendant for the Spring 2020 semester, or securing students loans and/or scholarships to make such payments.

95.     Plaintiffs and the members of the Class have suffered damages as a direct and proximate result of Defendant's breach, including being deprived of the in-person instruction and access to campus facilities, events, and resources that they were promised.

96.     Defendant has failed to compensate Plaintiffs and the Class for the damages they have suffered as a result of Defendant's actions.

97.     Specifically, Defendant has failed to refund or reimburse Plaintiffs and the Class the prorated portion of tuition and fees necessary to compensate them for the difference in value between what they bargained for and were responsible for paying, and what they received.

23

98. To the extent the COVID-19 pandemic frustrated the purpose of Plaintiffs' and the Class's bargain and expectation to attend in-person classes and have access to campus activities, facilities, resources, and services, Plaintiffs and the Class are excused from paying full tuition and fees and are entitled to receive the prorated portion of tuition and fees necessary to compensate them for the difference in value between what they were responsible for paying, and what they received.

99. Plaintiffs and the Class are entitled to damages representing the difference in value between what they contracted for and what they received.

100. Plaintiffs and the Class seek all damages and equitable relief to which they may be entitled.

## COUNT II

### Unjust Enrichment

101. Plaintiffs bring this claim individually and on behalf of the other members of the Class in the alternative to the breach of contract claim brought in Count I.

102. Plaintiffs and the Class conferred a benefit on Defendant in the form of tuition and fees for the Spring 2020 semester.

103. Defendant was aware of and voluntary accepted this benefit.

104. Plaintiffs and Class members were responsible for paying Defendant tuition and fees in exchange for in-person, on-campus instruction, along with access to campus facilities and resources, for the full duration of the Spring 2020 semester.

105. Beginning in mid-March 2020, as described above, Defendant failed to provide such instruction and access.

106. Despite failing to provide the benefits owed, Defendant has retained and appreciated the benefit of the amount of tuition and fees that Plaintiffs and the Class provided, to the detriment of Plaintiffs and the Class.

107. For the reasons set forth in this Complaint, the circumstances are such that

Defendant's retention of this benefit violates fundamental principles of justice, equity, and good conscience.

108.    Defendant has thus been unjustly enriched by Plaintiffs' and the Class's payment of tuition and fees for the Spring 2020 semester.

109.    There is no justification or cause for Defendant's failure to return the portion of the tuition and fees that Defendant has unjustly retained even though it failed to complete the services for which Plaintiffs and the Class conferred the benefit to Defendant.

110.    Accordingly, Plaintiffs and members of the Class are entitled to and seek disgorgement and restitution of the benefits unjustly retained, whether in whole or in part, including through refunds for tuition and fees.

## VI.    PRAYER FOR RELIEF

111.    Plaintiffs, individually and on behalf of the members of the Class, respectfully request that the Court enter judgment in their favor and against Defendant as follows:

a.      Certifying the Class as requested herein, designating Plaintiffs as Class representatives, and appointing the undersigned counsel as Class Counsel;

b.      Declaring that Defendant is financially responsible for notifying the Class members of the pendency of this suit;

c.      Declaring that Defendant wrongfully kept the monies paid by the Class;

d.      Awarding injunctive relief and restitution as permitted by law or equity;

e.      Awarding Plaintiffs' reasonable attorneys' fees, costs, and expenses;

f.      Awarding pre- and post-judgment interest on any amounts awarded; and

g.      Awarding such other and further relief as the Court deems just and proper.

## VII.    DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure on all causes of action so triable.

Dated: January 6, 2023

Respectfully submitted,

/s/ Elizabeth A. Fegan
Elizabeth A. Fegan
Fegan Scott LLC
150 S. Wacker Dr., 24th Floor
Chicago, IL 60606
Tel: (312) 741-1019
Email: beth@feganscott.com

Ellen T. Noteware
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
Email: enoteware@bm.net

E. Michelle Drake
BERGER MONTAGUE PC
1229 Tyler Street NE, Suite 205
Minneapolis, MN 55413
Tel: (612) 594-5999
Email: emdrake@bm.net

*Attorneys for Plaintiffs and the Class*

**CERTIFICATE OF SERVICE**

I, Elizabeth A. Fegan, an attorney, affirm that the foregoing Second Amended Complaint

was filed on January 6, 2023 on ECF, which automatically served all counsel of record.

Dated: January 6, 2023                           Respectfully submitted,

                                                  /s/ Elizabeth A. Fegan
                                                 Elizabeth A. Fegan